Argued and submitted March 19, reversed and remanded September 19, 1984

# 1000 FRIENDS OF OREGON,
*Petitioner,*

*v.*

# LAND CONSERVATION AND
# DEVELOPMENT COMMISSION,
*Respondent.*

## (83-ACK-105; CA A29157)

688 P2d 103

718

Michael B. Huston, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, Michael C. Reynolds, Assistant Attorney General, and Mary J. Deits, Assistant Attorney General, Salem.

Paul J. Speck, Bend, filed a brief amicus curiae for Jefferson County.

Before Gillette, Presiding Judge, Joseph, Chief Judge, and Young, Judge.

GILLETTE, P. J.

## GILLETTE, P. J.

Petitioner 1000 Friends of Oregon (1000 Friends) seeks review of respondent Land Conservation and Development Commission's (LCDC) acknowledgement of Jefferson County's comprehensive plan. 1000 Friends attacks LCDC's approval of 15 "exception" areas in agricultural land bordering the City of Madras and of a provision of the comprehensive plan's Range Land (RL) zone permitting the unreviewed creation for three years of one 40-acre parcel per year out of larger parcels. We reverse and remand.

### EXCEPTION AREAS

Because of recent statutory changes and decisions of this court, the first question to consider is the criteria by which we evaluate LCDC's approval of the exception areas. Before August, 1983, LCDC recognized, in Goal 2 and in its administrative rules, three bases for exceptions to the requirements of the resource goals: need, built upon and committed. The needs exception was provided in Goal 2 itself, and required consideration of the need for the exception, alternatives to it and the effects of granting the exception.[1] LCDC, by rules adopted in July, 1982, made these Goal 2 requirements more specific. *Former* OAR 660-04-020 (*amended* December 30, 1983). LCDC developed the built upon and committed exceptions after the adoption of the goals; it also gave them formal status in July, 1982. *Former* OAR

---

[1] *Former* Goal 2, Part II, provided:

"EXCEPTIONS: When, during the application of the statewide goals to plans, it appears that it is not possible to apply the appropriate goal to specific properties or situations, then each proposed exception to a goal shall be set forth during the plan preparation phases and also specifically noted in the notices of public hearing. The notices of hearing shall summarize the issues in an understandable and meaningful manner. If the exception to the goal is adopted, then the compelling reasons and facts for that conclusion shall be completely set forth in the plan and shall include:

"(a) Why these other uses should be provided for;

"(b) What alternative locations within the area could be used for the proposed uses;

"(c) What are the long term environmental, economic, social and energy consequences to the locality, the region or the state from not applying the goal or permitting the alternative use;

"(d) A finding that the proposed uses will be compatible with other adjacent uses."

660-04-025 (*amended* December 30, 1983). In August, 1983, after LCDC's action in this case, we held that these last two exceptions procedures were invalid because they permitted exceptions that did not comply with the goal criteria; only the needs exception, which was in the goal itself, was permissible. *Marion County v. Federation for Sound Planning,* 64 Or App 226, 232-235, 668 P2d 406 (1983). On the same day, we applied our decision in *Marion County* to sustain 1000 Friends' challenge to exceptions taken in the Marion County comprehensive plan, although 1000 Friends had not itself challenged the validity of the exceptions processes. We did so because our contemporaneous disposition of the two challenges to the same comprehensive plan justified our treating challenges to the exceptions in the two cases in the same manner. *1000 Friends of Oregon v. Marion County,* 64 Or App 218, 224 n 4, 668 P2d 412 (1983).

In this case, as in *1000 Friends of Oregon v. Marion County, supra,* 1000 Friends has challenged the application, not the validity, of the built upon or committed exceptions before LCDC and in this court, and there is no other party who does challenge their validity. Still, having once declared the built or committed exceptions improper, there would be a certain incongruity in our disposing of a later case as if the exceptions were permissible. Fortunately, this incongruity has been remedied by legislative developments.

One day before our *Marion County* decisions, a legislative revision of the exceptions process became law. Or Laws 1983, ch 827, § 19a (codified as ORS 197.732). It enacted into law all three bases for exceptions and provided new criteria for each. Future LCDC decisions on exceptions will be made according to the new statutory criteria and to the rules LCDC recently adopted to explain and expand on them. *See* OAR 660-04-000 to 660-04-035 (filed December 30, 1983, and March 21, 1984). The criteria do not affect exceptions which were validly adopted under the old criteria. ORS 197.732(9).[2] The statutory and rules changes place this judicial review proceeding in an interesting posture. If we were first to

---

[2] ORS 197.732(9) provides:

"An exception acknowledged under ORS 197.251, 197.625 or 197.630(1) (1981 Replacement Part) on or before August 9, 1983, shall continue to be valid and shall not be subject to this section."

examine the exceptions taken by the county and approved by LCDC under the old statutory scheme, we might find them impermissible for the reasons expressed in *Marion County v. Federation for Sound Planning, supra,* and *1000 Friends of Oregon v. Marion County, supra.* However, on remand the new statutory criteria and administrative rules would apply. As it happens, those new rules and criteria are the functional equivalent of the ones under which LCDC believed (incorrectly) it was properly operating when it decided this case in the first place. We think it follows from the foregoing that this is a case in which it is appropriate to go ahead and examine the exceptions under the new criteria because LCDC has already expressed its view on how it would apply those criteria, and the new ones are sufficiently similar to the old ones. Any action which would be valid under the former rules would be valid under the new criteria and rules.

The contested exceptions areas encircle Madras and its Urban Growth Boundary (UGB) on three sides, starting on the north and continuing around the east, ending up south of the city. There is only one small gap. All the areas border on the UGB or are directly connected to it by other exceptions areas, including several which 1000 Friends does not challenge. Their physical arrangement gives the appearance that they have the effect of extending the UGB through the exceptions process. The county describes them as being in a transition area which cannot be included in the UGB because of the inability to extend sewer service to them. All the areas are planned RR (rural residential), with the ultimate planned use being scattered homes on one or two acre lots. Some of the challenged areas are presently zoned DR (development reserve), with a provision that the DR areas adjoining the Madras UGB be considered for inclusion in the UGB before rezoning to RR.[3] Much of the land in the DR areas is presently in irrigated agricultural use; most of the rest is undeveloped.

The basis on which the county took the challenged exceptions, and on which LCDC approved them, is unclear.

---

[3] The county in its submission to LCDC noted that five of the areas—M-2, M-6, M-11, M-16 and M-17—are zoned DR. It appears that two other areas—M-23 and M-25—are also zoned DR. The first five areas abut the Madras UGB; the latter two do not. There is apparently no requirement that those two areas be considered for inclusion in the UGB before rezoning to RR.

LCDC stated that the county took them "on the combined basis of commitment and need." It also stated that "a 'needs' exception for these areas, standing alone, would be an inadequate basis for an exception. * * * [T]his report relies primarily on the findings of commitment provided in supporting the County's exceptions taken on the combined basis of commitment and need." 1000 Friends argues, with considerable force, that these statements show that LCDC failed to find that the areas met all requirements of *either* the needs or committed exceptions and, instead, approved them on some combination of the two. LCDC disputes this interpretation of its action,[4] apparently agreeing—as do we—that it could not properly approve the exceptions without finding that each area met *all* of the requirements *for at least one kind of exception.* The most plausible explanation of LCDC's action is that it found that the county failed to show a need for the areas but used the information tending to show a need to bolster the claim that the areas are committed. For the purposes of this opinion, however, we give LCDC the benefit of the doubt and assume that it found that the areas fully satisfy the requirements for both exceptions.

██  The questions on our review of LCDC's approval of the exceptions are, first, whether LCDC's determination that the county's findings and reasons demonstrate that the exceptions areas are either needed or committed, and, second, whether its statement of reasons explaining that determination are legally correct. ORS 197.732(6)(b), (c). Although LCDC would be bound by the county's findings of fact if they were supported by substantial evidence, ORS 197.732(6)(a), whether LCDC was correct in finding such substantial evidence is a question of law. The relevance of the facts that the local government found to the criteria for the exceptions and

---

[4] In its brief, LCDC attempts to explain its language by suggesting that it approved the five contiguous DR areas on the basis of *both* need and commitment and that it approved the other exceptions on the basis of commitment alone. The record does not permit this interpretation of LCDC's action. The county's justifications for several non-DR areas, including M-7, M-22 and M-26, rely heavily on an alleged need for the land to accommodate future population. These areas must be among those the county took partially on the basis of need and therefore among those LCDC approved on the combined basis of commitment and need.

the issue of whether the facts found show that the areas meet the requirements for the exceptions are also questions of law.[5]

---

[5] This statement makes the situation appear simpler than it is. In fact, it is difficult to fit what occurred in this case—and what may occur in many acknowledgment cases—into normal administrative fact finding procedures. The county did not develop its comprehensive plan through procedures similar to a contested case. There were public hearings on the plan and its amendments, but the character of those hearings and what transpired at them is not in the record. The county's factual findings consist simply of data sheets summarizing certain characteristics of each exceptions area and, for most of the areas, a short narrative which combines facts and conclusions in an attempt to show that the area is committed. So far as we can tell, these findings are also the only facts in the record. Because the findings are not based on an evidentiary record, they are necessarily not supported by substantial evidence in the record.

The legislature and LCDC expect those objecting to a proposed plan acknowledgment to present additional facts as part of their objections, but they do not state how those additional facts can affect the county's findings. ORS 197.251(4) provides that LCDC, in reviewing acknowledgement requests, "shall not allow additional evidence or testimony that could have been presented to the local government *or to the director* but was not." (Emphasis supplied.) OAR 660-03-020(1) provides a period of time after submission of the acknowledgement request for interested persons to submit their comments to the Department of Land Conservation and Development. OAR 660-03-020(4) provides that LCDC will not allow additional testimony or evidence that could have been presented to the director in accordance with the rule but was not. The Amadeo memorandum, *infra*, in explaining ORS 197.732(6)(a), states that LCDC "can only consider new evidence outside the local record which is allowed to be submitted through the existing acknowledgement review process." LCDC thus has the authority to consider facts which are not in the local government's evidentiary record, if there is one, if the objector submits those facts to the director in time. This would seem to be a futile exercise if the local government's findings supported by substantial evidence in the record would still be conclusive. However, those findings are not supported by substantial evidence in this case.

The legislature has tried to force the acknowledgement procedure into the Procrustean bed of a contested case, but those involved in the field know that acknowledgement is *sui generis* and apparently go their merry way, ignoring contested case procedures. In this case, the county presented facts in its acknowledgement request which are not supported by substantial evidence, 1000 Friends in its objections presented additional facts which also are not supported by substantial evidence, and no one has raised any questions about the procedure. There do not appear to be significant factual conflicts, at least so far as the exceptions areas are concerned. For lack of any better alternative, we will accept as correct *all* facts presented.

That we accept the facts as correct does not mean that we are bound by the legal conclusions the county or LCDC drew from them. Whether a given set of facts shows that an area qualifies for an exception requires applying the statute and the appropriate rules to the accepted facts. As the Amadeo memorandum explains:

"[T]he Commission independently decides whether a local government's findings and reasons demonstrate if the exception standards have or have not been met. Neither the [LUBA] Panel nor Commission are [sic] bound as are Courts traditionally to merely decide if a local government's decision meets all the procedural requirements and was supported by substantial evidence and findings.

The former Goal 2, Part II, needs exception is phrased in terms of criteria which the local government should discuss, and the needs exception in ORS 197.732(1)(c)[6] is phrased in terms of standards the local government must meet, but the considerations in each case are similar. Each requires a showing that areas that do not require an exception cannot accommodate the proposed use, and each requires a statement of reasons that the goal should not apply. *Former Goal 2 II(a), (b); ORS 197.732(1)(c)(A), (B).* The county's strongest claim for a needs exception is for the DR areas adjacent to the UGB, and we will look at that claim first.

In *Still v. Board of County Comm'rs,* 42 Or App 115, 122, 600 P2d 433 (1979), *rev den* 288 Or 493 (1980), we stated:

"* * * A market demand for rural residential development * * * does not constitute a 'need' for it, as that word is used in Goal #2. Goal #3 was enacted to preserve agricultural land from encroachment by urban and suburban sprawl by subordinating the free play of the marketplace to broader public policy objectives. Land is not excepted from the agricultural goal merely because somebody wants to buy it for a house."

Rather, the Panel and the Commission decide if the local government's findings and reasons demonstrate compliance."

We take this statement to mean that whether the county has shown adequate justifications for the proposed exceptions is a question of law, both for LCDC and for us. While that determination is for LCDC in the first instance, we review whether it is correct, giving such deference to the agency as its special expertise, if any, may justify. ORS 183.482(8)(a); ORS 197.732(6)(b).

[6] ORS 197.732(1)(c) provides:

"(1)   A local government may adopt an exception to a goal when:

"* * * * *

"(c)   The following standards are met:

"(A)   Reasons justify why the state policy embodied in the applicable goals should not apply;

"(B)   Areas which do not require a new exception cannot reasonably accommodate the use;

"(C)   The long term environmental, economic, social and energy consequences resulting from the use at the proposed site with measures designed to reduce adverse impacts are not signicantly more adverse than would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site; and

"(D)   The proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts."

The parties agree that a memorandum of May 27, 1983, from Pat Amadeo of the Governor's office to the members of the Senate Committee on Environment and Energy (the Amadeo memorandum) provides the authoritative statement of the legislative purpose in adopting ORS 197.732. The memorandum quotes most of the above language from *Still* and also states:

"[I]t is very important to note that it is the intent of [ORS 197.732(1)(c)(A)] that the Commission not change its existing policy and rules pertaining to exceptions for rural residential housing on resource lands. That rule now allows housing to support economic activities which require or need a rural location but does not allow rural residential development based solely on general market demand, past development or population trends."

Jefferson County claimed a need for the DR exception areas because it expected significant population growth outside existing UGBs and these lands were necessary to accommodate them. That analysis is inadequate. So far as we can tell, it is based precisely on the "general market demand, past development or general market trends" which the Amadeo memorandum indicates is impermissible. In addition, as LCDC recognized, the county made no effort to determine if densities within existing UGBs could be increased to handle the expected growth. Without that determination, it is impossible to say that the DR exceptions areas are needed to provide for growth. The county's submissions and an aerial photograph in the record show that there is presently a large amount of undeveloped land within the Madras UGB. There is no discussion in the record of how many people it can accommodate at urban densities. There is a total failure to show that there is any "need" for residential land outside the county's UGBs.

LCDC found that a plan provision requiring a review of the adjacent DR areas for possible inclusion in the Madras UGB before rezoning to RR made up for the failure to show that the areas were needed. We do not see how the provision could do so for those areas; it certainly did not for the non-adjacent DR areas. Jefferson County has planned all the exceptions areas as rural residential. Under the DR designation, those lands may later be changed to RR zoning and developed without further LCDC involvment, even if they do not qualify for inclusion in the Madras UGB. All that the plan

requires is a hearing to *consider* expanding the UGB; rezoning can occur, whatever the results of the hearing. That provision is meaningless. LCDC found little else to justify a needs exception. Its analysis is even weaker for the non-DR areas. It erred to the extent that it approved the exception areas on the basis of need.[7]

The committed basis for the exceptions is stronger than is the need basis. Most of the areas have portions on which homes have been built, many of them in platted and partially developed subdivisions. 1000 Friends does not dispute that those portions are committed. Other portions of the areas, however—in many cases the major portions—are in irrigated or dry land agriculture, in grazing or are presently unused.[8] The county explained its determination that the entire areas are committed with a general statement covering all of the areas and specific information on each individual area.[9] Its general statement refers to the division of the areas into separate parcels and ownerships and states that they are not developed to the maximum usable density, which it apparently assumes to be two-acre parcels. It then rejects possible expansion of the Madras UGB into the areas covered by the exceptions because of fiscal inability to expand the Madras sewer system sufficiently. It continues:

"The better alternative to UGB expansion is to locate needed development in rural areas which will not conflict with agriculture. The development should be at a density which will not create new urban density developments, so that

---

[7] The county suggests that ORS 197.712(g)(A), which requires local governments to provide reasonable opportunities to satisfy local and rural needs for residential and industrial development and other economic activities outside urban growth boundaries, supports the county's actions. It suggests no reason why we should construe the statute as having a different meaning from that of the needs exception in ORS 197.732(1)(c). The same legislature adopted each provision, and we do not think that it intended to require local governments to satisfy needs which they could not otherwise show existed.

[8] That land is unused is not a basis for finding it committed to non-resource uses. The issue is not whether making the land available for non-resource use would interfere with the existing resource uses but whether the land is committed to non-resource uses. Evidence that it is not used for any purpose is, if anything, evidence that it is *not* committed.

[9] Although we review LCDC's action, not the county's, we must necessarily evaluate the basis for the county's decision in order to evaluate LCDC's approval of it. This is especially true in this case because LCDC's findings are ambiguous, unfocused and limited.

additional UGB's and urban-agricultural conflicts are not created. These areas should be on the least productive land available in the area, and, unless otherwise necessary, should be adjacent to land already committed to rural development."

■ The county's discussion is directed to the need to develop the exception areas, not to the extent of their previous commitment to rural residential uses. Nothing in this statement shows that uses allowed by the applicable goals are impracticable. ORS 197.732(1)(b). The county appears to be making a weak *knees* justification rather than a *committed* justification, or possibly to be establishing a basis for extending the UGB in the future. It seems, in fact, to assume continued sprawl and to try to direct it where it will do the least damage. (The assumption of two acre lots for these areas can only be described in this way.) The county's general justification of these committed exceptions is not in itself adequate.

■ LCDC apparently sustained the committed exceptions because divided ownerships and residential developments surrounding most of the agricultural land in the exception areas make continued agricultural use impracticable. It thus implicitly accepted the county's specific justifications for the individual areas.[10] For each exception area the county provided general information on ownerships, lot sizes, services and adjacent uses. Much of the information was similar for all of the areas, and there are similar problems with the county's analysis. All of the areas have certain basic services—electricity, domestic water and telephones. A number have irrigated agriculture closely adjoining existing rural residential development. The county treats this juxtaposition as creating inevitable conflicts from spray drift, field burning smoke and plowing dust, and it proposes to resolve the conflicts in favor of residential use. While these

---

[10] It is questionable whether LCDC's findings constitute a "clear statement of reasons which sets forth the basis for the determination" that the committed standards have been met. ORS 197.732(6)(c). The findings on the basis for the exceptions are ambiguous and do not discuss in any depth reasons showing that the areas are committed. LCDC acted before the new exceptions statute became law, but it was then required on acknowledgement review to adopt "a clear statement of findings" in support of its determination of compliance with the goals. ORS 197.251(5)(b). While 1000 Friends points out some of the ambiguities in LCDC's findings, it does not argue that the decision as a whole fails to meet these requirements. We will therefore not decide the issue.

conflicts may be a factor in showing that it is impracticable to continue agricultural use of an area, they are not conclusive. People who build houses in an agricultural area must expect some discomforts to accompany the perceived advantages of a rural location. If problems of this sort by themselves justified a finding of commitment, it would be impossible to establish lasting boundaries between agricultural and residential areas anywhere, yet establishing those boundaries is basic to the land use planning process.

■          Materials in the record show the average parcel size, the number of parcels and the largest and smallest parcels in each area. The county noted that all post-1973 partitions were made pursuant to the county's 1973 comprehensive plan, but it did not otherwise discuss how the existing development pattern came about or how previous partitioning decisions related to the goals. OAR 660-04-028(2)(c)(A) requires this information and also provides:

> "Past land divisions made without application of the Goals do not in themselves demonstrate irrevocable commitment of the divided land. Only if existing development on the resulting parcels or other factors prevent their resource use or the resource use of nearby lands can the parcels be considered to be irrevocably committed. Resource and nonresource parcels created pursuant to the applicable goals shall not be used to justify a committed exception."

There is also no information on any separate parcels that may be farmed as a unit, as OAR 660-04-028(2)(c)(B) requires.[11] Without knowing how present development came about, and with only limited information on present use, it is difficult to determine if future development is the unavoidable result of the Madras area's growth or whether it will continue previous patterns which themselves developed contrary to the goals. The information for each area on the number of potential buildable lots, assuming two acres to a lot, is irrelevant to whether the area is committed, as is the information on soil classes. Much of the other information goes to the needs exception that we have already found to be unsupportable. We now turn to a discussion of the specific areas with these considerations in mind.

_____

[11] *Former* OAR 660-04-025(5), (6) (*amended* December 30, 1983) had similar requirements to those of OAR 660-04-028(2)(c).

Areas M-2, M-5, M-6, M-7, M-9, and M-13 together run along the northeastern boundary of the Madras UGB and part way down its eastern side. They have areas of residential development and also, as ground and aerial photographs make abundantly clear, a large irrigated agricultural area at their heart, directly connected with agricultural areas within the UGB. Other portions of the areas are in dry land farming or are unused. The residential areas, including partially developed platted subdivisions, are probably either built upon or committed, but we cannot say from the information in the record that the agricultural area or the undeveloped areas are committed.

The northern portions of M-2 and M-5 are undeveloped and in large parcels which the county has not shown to be committed. According to 1000 Friends, they include several 40-acre parcels. These exceptions areas also include part of the irrigated agricultural section we described above. M-6 consists almost entirely of irrigated agriculture. M-7 is at the edge of these areas and, except for a few houses at the northern end, is entirely undeveloped. The county's only justification for an exception for the undeveloped portion is that it will provide for projected population growth. M-9 has a residential area in the center with several large agricultural parcels connected to the agricultural portions of the other areas. Those parcels, particularly the ones east of the residential area, have not been shown to be committed. M-13 has some development in the east and a large agricultural parcel, part of the same area, in the west. The county has not shown that any of these areas is committed in its entirety.[12]

Area M-11 is a 320 acre strip along the eastern side of the Madras UGB. The county states that it is unused; 1000

---

[12] Some of the information in this paragraph comes from the county's previous submission to LCDC as well as from its current submission. LCDC found that the first submission did not demonstrate commitment. It appears that the county, on its second submission, omitted some information which tended to show a lack of commitment in these areas. The record on M-5 and M-7 provides examples of that tendency.

LCDC, in responding to 1000 Friends' objections to these areas, apparently placed the burden on 1000 Friends to show that the areas are not committed. That is improper. LCDC's role is to use all of the information available, including that presented in objections, to make its independent determination of whether the county has shown that the exceptions are justified. LCDC should evaluate the strength of the county's case, not the weakness of the objector's.

Friends, supported by an aerial photograph, states that it has a portion in dry land farming. In any case, there is no information showing it to be impracticable to preserve the area for resource uses. M-16 and M-17 are connected areas on the southeast of the UGB. They are presently undeveloped except for a small amount of farming. Their eastern boundary is irrigated agriculture. The county's justification is that they are needed; there is no information showing that they are committed. M-18 is directly south of M-17. It has some residential development and at least one 38-acre parcel; it is bordered on three sides by open agricultural lands. The county has not shown that the entire area is committed.

Areas M-22, M-23 and M-25 are connected areas south of Madras. There are unchallenged exception areas between them and the UGB to the north. M-22 is in two parcels. According to the county, the northern parcel is currently in horse pasture with little present conflict with surrounding uses. The county has not shown that it is committed. The southern section has some agricultural production. On the west is irrigated agriculture, and on the east is M-24. Nothing shows that M-22 is committed. M-23 and M-25 together form an actively farmed area, with some housing on the edges. The county states that there are conflicts between agricultural and residential uses because of plowing, spraying and burning. This conflict is not sufficient, given the limited residential development and the active agricultural use, to show that continued agricultural use is impracticable.

Area M-24 is east of the previously discussed areas and is in two parcels, one mostly west of Highway 97 and one east of Highway 26. Between the two parcels, and separated from them by the highway grades, is a triangle of agricultural lands. The land in the exceptions area is heavily subdivided and built on, with a few larger parcels and some personal farms. The development in the area makes it likely that the entire area is committed. However, this area appears to be a strip development, and the county has not adequately discussed how the goals were applied to its creation. For this reason, we cannot say at present that it qualifies for a committed exception.

Area M-26 is a square mile located directly east of M-24. The northwestern corner is a developed subdivision which has been extended by a plat over an additional portion of the area. Part of the area is agricultural, and the rest is unused. There is nothing to support a finding that the area is committed, except for the portion actually built upon. A platted but undeveloped subdivision does not show commitment.

Because the county treated each exception area as a unit, and because LCDC approved each area as a unit, our determination that there are portions of each area which the county has not shown to be committed requires us to reverse LCDC's approval of the entire areas. For the county to justify built upon or committed exceptions, it will have to focus on precise, probably disconnected, areas rather than attempting to ring the UGB with exception areas. To comply with the statute and to aid our review, the county and LCDC should carefully distinguish factors which they believe show that a particular area is committed from those which they believe show that it is needed. Our review of these exceptions has been hampered by the limited information the county provided, the lack of an evidentiary record, LCDC's ambiguous approval of the exceptions and the failure of both the county and LCDC clearly to distinguish the information relevant to the needs exception from that relevant to the committed exceptions. The county and LCDC on remand should keep in mind that an exception must be just that—exceptional.[13]

## RANGE LANDS

The comprehensive plan places over a third of Jefferson County in the RL (range land) zone, planned for livestock ranching and related agricultural uses. It is an exclusive farm use (EFU) zone under ORS 215.203-215.337. Many units in this area are large—some are over 60,000 acres—and the plan states that it is impossible to establish a minimum lot size sufficient to insure agricultural use of the land unless the minimum is far larger than that used anywhere else. The county nevertheless adopted a 40-acre minimum lot size,

---

[13] The reasons for our rejection of the committed exceptions apply under the criteria of *former* OAR 660-04-025 (*amended* December 30, 1983), as well as under the current criteria.

which is half the minimum size for the A-1 (irrigated agricultural) zone. After LCDC rejected its original submission, the county modified the regulations concerning the RL zone so that they now permit the creation each year of one 40-acre parcel from each larger holding for three years. The creation at any time in the future of a fourth parcel from a holding existing at the adoption of the plan will require approval as a subdivision. The county also placed restrictions on building on the parcels as a way of preserving agricultural uses. If a parcel is over 320 acres, the county would allow farm dwellings and related buildings as a matter of right. It assumes that smaller parcels are non-agricultural and permits dwellings on them only if they meet the statutory requirements for non-farm dwellings in an EFU zone.[14]

LCDC explains that the county has not chosen to protect its agricultural range land by either a minimum lot size standard or by performance standards to be applied individually to each partition. Rather, it has chosen a combination of the two, seeing the placement of a dwelling, rather than the partition, as the crucial event taking the land from agricultural use. The requirement of subdivision approval for the fourth partition combined with the generally large landholdings in the area will, the county and LCDC believe, make the impact of this provision on the livestock industry minimal. They point out that there have been very few sales of parcels of this or smaller size in recent years and that only some of those sales involved new owners rather than sales among existing ranchers. LCDC states that it expects less rather than more development under this plan than will occur in other counties which rely solely on minimum lot sizes. We find LCDC's reasoning interesting but not persuasive.

Goal 3 provides that:

---

[14] At the time the county and LCDC acted, ORS 215.213(3) governed nonfarm dwellings in EFU zones. The 1983 legislature modified ORS 215.213(3) and added ORS 215.283(3) as an alternative set of criteria. Or Laws 1983, ch 826, §§ 6, 17. The county may use either statute to test nonfarm dwellings unless it chooses to designate marginal lands under ORS 197.247 or to allow dwellings under ORS 215.213(4) to (8); in that case, it must use ORS 215.213(3). ORS 215.288. The Jefferson County Comprehensive Plan refers only to ORS 215.213(3) as controlling its designation of nonfarm dwellings. We assume that the county will in fact use either set of criteria to the extent that it is legally able to do so.

"[s]uch minimum lot sizes as are utilized for any farm use zones shall be appropriate for the continuation of the existing commercial agricultural enterprise within the area."

1000 Friends argues, and the county and LCDC apparently concede, that a 40-acre parcel is not usable for livestock raising unless it is combined with larger neighboring parcels. LCDC, in fact, assumes that the 40-acre lots will be for nonfarm purposes. It states that "this minimum lot size is intended to function as one which is appropriate for nonfarm dwellings where the standards of ORS 215.213(3) and others are met." The county justifies the 40-acre minimum in part as being large enough that the rancher who sold it originally would be willing to repurchase it from a disillusioned suburbanite. These explanations clearly contemplate that the 40-acre parcels will ultimately be taken out of range land use. The 40-acre minimum does not adequately protect range land and thus does not comply with the minimum lot size provisions of Goal 3.

LCDC's position seems to be that the 40-acre minimum combined with the restrictions on building constitute performance standards that insure that land will be committed to non-range use only after application of the statutory standards for nonfarm dwellings.[15] It states that "the creation of a 40-acre parcel is not considered by Jefferson County to be either a nonfarm parcel or an acreage homesite and the creation of such a parcel in no way implies approval of a nonfarm dwelling." Yet it also states that "this minimum lot size is intended to function as one which is appropriate for nonfarm dwellings where the standards of ORS 215.213(3) and others are met." These statements may not be logically inconsistent, but they underline that neither LCDC nor the county has suggested any purpose for 40-acre parcels other than nonfarm dwellings. So far as the record reveals, there simply is nothing both agricultural and economically profitable that one can do with a 40-acre parcel of range land in Jefferson County.

---

[15] LCDC describes the county's approach as one of combining a minimum lot size with a special performance standard. Because LCDC recognizes that a minimum lot size by itself would not comply with Goal 3, we think it clearer to treat the provisions as special performance standards, with the minimum lot size as one of the standards.

This point becomes more important when one considers the statutory provisions that will apply to these parcels. With the county's permission—and there are no standards to guide the county in giving or denying permission—the owner of a lot may use it for a private park, a hunting reserve, a campground or a private use airport. One can readily envision someone who permanently resides far from Jefferson County buying a 40-acre parcel and coming with his or her friends and their recreational vehicles to camp and hunt on it. That person might even drill a well and bring electricity on the land, providing hookups for the vehicles. One can also envision a hunting club buying a parcel and setting up a camp on it. There would suddenly be precisely the uses the goal is designed to prevent, and the diversion of land from agricultural use it is designed to forestall, all occurring with no necessity to consider the purposes of the goal.

■■ Even without those developments, the creation of the parcel is a change in the situation which makes it more likely that the county will ultimately approve a dwelling. One criterion for approval of a nonfarm dwelling in an EFU zone is whether the land is generally unsuitable for farm use, and one test of unsuitability is the size of the tract. ORS 215.213(3)(b); ORS 215.283(3)(d). The very creation of a 40-acre parcel makes it unsuitable for range use unless it is worked in conjunction with the neighboring land, and LCDC and the county have given no reason to believe that people are likely to purchase parcels of this size simply to lease them back to the rancher from whom they were purchased.[16] Contrary to LCDC's analysis, the proper time to apply the standards is when the parcel is created; the creation of the parcel—and possibily its subsequent use—changes the situation in a way which will make approval of a nonfarm dwelling more likely than it would otherwise be, contrary to the purposes of the

---

[16] Under ORS 215.213(3)(b) lot size is a criterion only if the parcel cannot reasonably be put to farm use in conjunction with other land. The 1983 legislature added this limitation; it was not in existence when LCDC acknowledged the plan. Or Laws 1983, ch 826, § 6. ORS 215.283(3)(d) does not have this limitation; so long as the county does not act to designate marginal land under ORS 197.247 or to allow the establishment of dwellings under ORS 215.213(4) to (8), it is free to apply the less restrictive criterion. Thus, we need not determine whether the limitation applies only if the other land is in the same ownership as the parcel in question.

goals. While Jefferson County's approach may be innovative, it is not adequate.[17]

■ As the foregoing demonstrates, LCDC's decision is inadequate to meet either the former (need) or the additional present (built or committed) statutory and regulatory criteria for the acknowledgement of the Jefferson County Comprehensive Plan.

Reversed and remanded for further proceedings.

---

[17] We cannot find, as LCDC and the county have asked us to do, that the Jefferson County Comprehensive Plan meets the recently adopted substantial compliance test of ORS 197.747. The test provides that " 'compliance with the goals' means the comprehensive plan and regulations, on the whole, conform with the purposes of the goals and any failure to meet individual goal requirements is technical or minor in nature." This test is for LCDC to apply in the first instance, and it has not done so. In any event, we have not been asked to review the entire Jefferson County plan and thus cannot say whether, on the whole, it conforms with the purposes of the goals. Our previous discussion shows that the goal violations we have identified are neither technical nor minor.