Argued and submitted June 7, reversed and remanded for reconsideration
October 2, 1985

COLLINS et al,
*Petitioners,*

*v.*

LAND CONSERVATION AND
DEVELOPMENT COMMISSION,
*Respondent.*

(84-ACK-176; CA A33599)

707 P2d 599

Richard P. Benner, Portland, argued the cause for petitioners. With him on the brief was Robert E. Stacey, Portland.

Jeffrey Bennett, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Petitioners seek judicial review of an acknowledgment order issued by the Land Conservation and Development Commission (LCDC) declaring that the City of Jacksonville's comprehensive plan and land use regulations (Plan) are in compliance with LCDC's Statewide Planning Goals. The issues on review are whether LCDC violated ORS 197.251 and Goal 5 by acknowledging the Plan without the required identification and evaluation of conflicts over the use of open spaces around the city's historic buildings and whether LCDC violated ORS 197.251 and Goal 14 by approving an urban growth boundary (UGB) with nearly 700 acres of land that are not needed for projected expansion. We reverse and remand for reconsideration.

■ Petitioners contend that LCDC violated Goal 5, OAR 660-16-005 and OAR 660-16-010 in issuing the acknowledgment order, because the Plan contains no identification of conflicts with the use of historic sites, no evaluation of the economic, social, environmental and energy (ESEE) consequences of conflicting uses and no provision for a program to meet Goal 5. Petitioners argue: The city may not simply set up an Historical and Architectural Review Commission (HARC), provide it with *some* guidelines and then use its existence under those guidelines to satisfy Goal 5; it must actively and presently comply with Goal 5, not delegate responsibility to HARC for future compliance; and the city must establish building-to-lot ratios to preserve open spaces around historic buildings. Petitioners rely on Goal 5 and the Goal 5 rules, OAR 660-16-000 through 660-16-010, that give local governments responsibility to analyze conflicts and to develop programs to meet Goal 5. Petitioners also rely on LCDC'c recognition of the importance of preserving open space around historic buildings. *See 1000 Friends v. Jacksonville,* 1 LCDC 302, 306 (1978).

Respondent contends that Goal 5 and the rules provide broad discretion to local planning agencies to implement the Goal's purpose. It argues that, by setting up HARC and providing it with several standards to use in reviewing proposed uses or changes, the city identified conflicting uses, provided that the ESEE consequences analysis would be done by HARC on a case-by-case basis and provided a program to

meet Goal 5. LCDC contends that Goal 5 does not require building-to-lot ratios and relies on the broad discretion provided in 197.005(3) for localities to determine their own land use programs. It also relies on the procedures in the Goal 5 rules and on the HARC review procedures provided in Jacksonville City Ordinances 17.49.040 and 17.4.070.

Goal 5 provides:

"GOAL: To conserve open space and protect natural and scenic resources.

"Programs shall be provided that will: (1) insure open space, (2) protect scenic and historic· areas and natural resources for future generations, and (3) promote healthy and visually attractive environments in harmony with the natural landscape character. The location, quality and quantity of the following resources shall be inventoried:

"a.   Land needed or desirable for open space;

"* * * * *

"i.   Historic areas, sites, structures and objects;

"* * * * *

"Where no conflicting uses for such resources have been identified, such resources shall be managed so as to preserve their original character. Where conflicting uses have been identified the economic, social, environmental and energy consequences of the conflicting uses shall be determined and programs developed to achieve the goal."

The Goal 5 rules define a conflicting use as "one which, if allowed, could negatively impact a Goal 5 resource site." OAR 660-16-005. The rules require local jurisdictions to develop a program to meet Goal 5, based on the ESEE analysis, by: (1) protecting the site fully by prohibiting all conflicting uses, (2) permitting conflicting uses fully despite their effect on the resource on the basis of a determination that the conflicting use is of sufficient importance relative to the resource sites or (3) permitting conflicting uses in a limited way to protect the resource site to some desired extent. OAR 660-16-010.

The whole City of Jacksonville is a designated National Historic Landmark. The city's downtown area contains several historic buildings. Before 1977, the city had an ordinance requiring all downtown buildings to provide off-street parking. That ordinance also provided a means to

maintain open space around historic buildings. The ordinance was repealed in 1977, and no alternative protective measures were adopted. In 1978, LCDC recognized the risk to the open spaces:

"[W]hat happens to the open spaces around buildings in the historic area affects the historic character of the area. It follows that construction on these open spaces is also likely to affect historic values."

*1000 Friends v. Jacksonville, supra,* 1 LCDC at 306 (1978).

In its 1983 continuance order, LCDC found that the city had failed to examine conflicts over the use of open spaces and the consequences of not maintaining them. LCDC also stated that neither Goal 5 nor *1000 Friends v. Jacksonville, supra,* requires the city to protect open space areas but that the city must base its comprehensive plan on an adequate determination of the conflicts and consequences. In its 1984 acknowledgment order, LCDC recognized that the revised Plan did not include a determination of the uses that conflict with historic resources. It noted that the city's land development regulations "do address demolition and exterior alteration * * *, the two most common historical resource conflicts." The Plan states that no problem would arise over the the use of open space, because the HARC review process would resolve any conflicts. LCDC's acknowledgment order provides that, although the requested analysis is not specifically provided in the Plan, a new finding in the Plan demonstrates the city's commitment to preserve open space around historic buildings.[1]

LCDC's acknowledgment order does not comply with the requirements of Goal 5 and the rules. They require a local

---

[1] LCDC's Acknowledgment Order states:

"A policy also has been adopted that establishes the primary purpose and responsibility of the HARC to 'protect and enhance historic qualities and characteristics of the Historic Landmark District' which includes the downtown commercial area. The policy further states that the HARC review shall mitigate any potential conflicts. The HARC review criteria and standards in Jacksonville's land development ordinance include consideration of building height, width, depth and compatibility with nearby buildings and maintaining the traditional alignment pattern of the existing buildings.

"The HARC regulations combined with the City's policy direction are sufficient to address and resolve potential conflicts between historic open space and building in the downtown area."

government's comprehensive plan to include certain findings and analysis. In its continuance order, LCDC found that the Plan did not comply with Goal 5 and stated in relevant part that, in order to comply, the city must:

"2.   Amend the plan to determine the conflicting uses of the historical resources identified within the National Landmarks District and analyze the economic, social, environmental and energy (ESEE's) consequences, as necessary. This must include a determination on the historic downtown open space areas.

"3.   Based on the determination in 2 above, amend plan policies and implementing measurers, as necessary, consistent with OAR 660-16-000."[2]

The revised Plan does not include the required determinations. The Plan states:

"Open spaces in and around the historic structures within the Landmark District, including the area designated on the zoning map as Historic Commercial (HC), were analyzed and it was found that conflicts will not arise by the retention, development or re-development of such open space areas in light of the establishment, control and authority of the Historical and Architectural Review Commission (HARC) and the standards and criteria utilized in its review and approval of all projects within the Landmark District."

That statement fails to support the conclusion that the city is in compliance with the relevant provisions of Goal 5.

The Goal 5 rules require a local jurisdiction to identify conflicting uses. LCDC contends that the fact that HARC was set up to resolve conflicts shows that the city identified the conflicts. That reasoning is circular. No evidence has been presented to show that, in fact, conflicts were identified. The city merely assigned any problem about conflicts to HARC. The city itself is required to identify existing conflicts and, if none exists, to preserve the resource. OAR 660-16-005(1). The city's Plan provides no mechanism to preserve open space. There are no requirements to maintain present levels of

---

[2] References to the continuance order and the acknowledgment order include references to the DLCD reports adopted by LCDC in its continuance and acknowledgment orders.

building land area. The city cannot rely on its directive to HARC to establish standards in the future.[3]

The rules also require a local jurisdiction to do an ESEE analysis. LCDC contends that HARC will make that analysis on a case-by-case basis as requests for approval are made. That does not comply with the rules. The rules require that the analysis be made in formulating the Plan and provide that determination of the consequences is adequate "if it enables a jurisdiction to provide reasons to explain why decisions are made for specific sites." OAR 660-16-005(2). The city has made no ESEE analysis but has, instead, delegated that responsibility to HARC. There is nothing in the Plan to provide reasons for decisions as to specific sites. We conclude that the Plan does not comply with Goal 5.

The Goal 5 rules further require a local jurisdiction to resolve conflicts with specific sites by developing a program to meet Goal 5. OAR 660-16-010. LCDC contends that, by setting up the HARC program with authority to review and authorize or prohibit proposed actions, the city has chosen the third alternative of permitting limited use. Again, that reasoning is circular, and the city did not express that purpose. The rule requires that in selecting that alternative the local government must

> "designate with certainty what uses and activities are allowed fully, what uses and activities are not allowed at all and which uses are allowed conditionally, and what specific standards or limitations are placed on the permitted and conditional uses and activities for each resource site. Whatever mechanisms are used, they must be specific enough so that affected property owners are able to determine what uses and activities are allowed, not allowed or allowed conditionally and under what clear and objective conditions or standards." OAR 660-16-010(3).

---

[3] In its Plan implementation strategies, the city provides:

"3. In order to maintain open spaces in and around historic buildings, structures and sites, the HARC shall establish conditions of approval for projects which would include limiting or altering the height, *bulk, setback,* design, openings, materials or colors of such improvements." (Emphasis supplied.)

In its acknowledgment order, LCDC recognized that

"[t]he City's Land Development Regulations do provide for general review of these design considerations but no specific historic open space ratio for downtown commercial property is established."

LCDC contends that the city's ordinances designating which activities in the Historic District require approval[4] and what factors HARC must consider in determining whether to grant approval[5] provide sufficient designation of which activities are allowed, not allowed or conditionally allowed. However, those ordinances and the Plan do not comply with Goal 5. There is no specific designation of permitted or prohibited uses. The Plan merely assigns responsibility for making those decisions to HARC. There are no clear and objective standards or conditions available for affected property owners. Further, an explanation of the reasons for selecting any alternative must be stated.

> "Reasons which support this decision must be presented in the comprehensive plan, and plan and zone designations must be consistent with the decision." OAR 660-16-010(1), (2) and (3).

There is no discussion in the Plan of reasons for choosing the third alternative, if in fact it was chosen. The rule makes it clear that the analysis must occur in the planning process in order to inform property owners of the choice of mechanisms to protect the resources. We conclude that Jacksonville's Plan fails to meet the requirements of the Goal 5 rules and fails to comply with Goal 5.

---

[4] The following activities require a certificate of appropriateness after approval by HARC:

"A. Demolition or removal of a historic building.

"B. Material change in the exterior appearance of existing buildings or structures by additions, alterations, reconstruction or maintenance involving exterior color change to an unlisted color.

"C. New construction of a building, structure or sign.

"D. Change in existing walls and fences.

"E. Removal of live trees or other significant vegetation."

[5] Among the criteria HARC must consider before approval of a certificate of appropriateness are:

"* * * * *

"B. Building Design.

"1. Building size and surroundings. The height, width and depth of the building should be compatible with the nearby buildings, especially those most adjacent (sic).

"* * * * *

"3. c. Alignment. The building should be aligned, parallel to the existing structures or the street, maintaining the traditional pattern."

■      Petitioners also contend that the proposed UGB contains land in excess of that needed or committed, in violation of Goal 14, and that land in many "Priority 3"[6] areas is currently unserviced by sewer or water or is otherwise unsuitable for urban use and thus does not fall within Goal 14. They rely on Goal 14's seven factors for determination of the proper size and location of an UGB, on maps provided by the city showing existing water and sewer service and land use and on this court's statement that "compliance with the goal cannot be achieved by allowing land that does not meet the goal's criteria to be included in a UGB on the basis of a local agency's promise not to treat that land as really being in the UGB." *1000 Friends of Oregon v. Washington County,* 72 Or App 449, 453, 696 P2d 554 (1985).

LCDC contends that many of the Priority 3 lands are committed, and it disputes petitioners' contentions about unserved areas. It also contends that the hillside areas are needed to provide a scenic backdrop to the downtown historic area. It relies on the maps provided by the city, on Goal 14's seven factors for determining the size and location of an UGB and on this court's statement that a locality may include more land than is needed in the UGB "[w]hen existing urban development or existing public facilities have 'committed' an 'unnecessary' piece of land to urban use * * * in order to avoid illogical development or service patterns." *City of Salem v. Families for Responsible Govt,* 64 Or App 238, 243, 668 P2d 395 (1983), *rev'd on other grounds,* 298 Or 574, 694 P2d 965 (1985).

Goal 14 provides:

"Goal: To provide for an orderly and efficient transition from rural to urban land use.

"Urban growth boundaries shall be established to identify and separate urbanizable land from rural land.

"Establishment and change of the boundaries shall be based upon consideration of the following factors:

"(1)   Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;

---

[6] The city has divided its land within the UGB into three categories. "Priority 3" areas are lands that the city has identified as having low priority for urban development.

"(2) Need for housing, employment opportunities, and livability;

"(3) Orderly and economic provision for public facilities and services;

"(4) Maximum efficiency of land uses within and on the fringe of the existing urban area;

"(5) Environmental, energy, economic and social consequences;

"(6) Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and,

"(7) Compatibility of the proposed urban uses with nearby agricultural activities.

"The results of the above considerations shall be included in the comprehensive plan."

The city has projected a need of 96.49 acres for planned development. The proposed UGB contains 792.9 acres. The disputed areas are all in the Priority 3 category.

In its 1983 continuance order, LCDC stated: "[T]he boundary * * * is not justified based on need or locational factors." LCDC also stated that

"[E]stablishment of an urban growth boundary must be based upon the seven factors in Goal 14. The City's plan clearly establishes that the adopted boundary provides much more land for residential uses than is needed. * * *

"Inclusion of land beyond need can sometimes be justified based upon analysis of more site specific factors (Factors 3-7). The plan lacks a site specific analysis of these factors."

LCDC concluded that, in order to comply with Goal 14, the city must:

"1. Adopt findings to justify the urban growth boundary consistent with the seven factors of Goal 14. Lands not needed for urban development (factors 1 and 2), which cannot be justified based on locational reasons (factors 3-7), must be excluded from the urban growth boundary.

"* * * * *

"3. In conjunction with "1" above, amend areas zoned SR-20 and SR-40 so that transition of land from urbanizable to urban uses is consistent with the four conversion factors of Goal 14. This must include for urbanizable areas, adoption of

a minimum lot size sufficient (e.g., 10 acres) to ensure orderly and efficient development upon conversion to urban uses. Adoption of a mandatory lot redivision process will be necessary if the lot size is less than ten acres (5-10 acre lots)."

When the city resubmitted the Plan for acknowledgment, it had made no changes in the UGB. LCDC observed:

"The urban growth boundary remains the city limits plus about 8 acres of land beyond the City. This is the same boundary proposed before by Jacksonville. The City and Jackson County have adopted identical new findings to justify the boundary location.

"* * * * *

"* * * The findings for Factor 1 of Goal 14 indicate the boundary is not based on need."

LCDC's findings as to commitment require further refinement. The city has not changed its UGB from the time of the continuance order when LCDC found that too much land was included. The revised Plan merely changes the city's analysis of commitment. The city's response to LCDC's requirement 1 that it adopt findings to justify the UGB states:

"The ongoing enlargement of the City's water capabilities provides for adequate service. The question of sewer service to the City has been resolved and the solution will result in servicing the forecasted population."

In addition, the Plan states:

"[A] large portion of the land area included within the existing urban growth boundary and the city limits is committed in terms of lot sizes, divisions, and redivision, surrounding urban and suburban residential development and existing homesites upon large parcels."

The city states that these areas include the Westmont Hills area, properties along both the east and west sides of South 3rd Street and the areas along both sides of South Oregon and Hill Streets and Applegate Road.

LCDC's response to petitioners' objections as to whether those areas are committed states that the maps included show:

"That *some* services are in place and *some* residential development does exist in these priority #2 and #3 areas at

the northwest and southwest portions of the boundary."
(Emphasis supplied.)

In its conclusion of compliance with Goal 14, LCDC states that

"*Some* areas to the northwest and southwest side of the boundary are committed to low density residential development with sewer and/or water service provided to these areas." (Emphasis supplied.)

*Some* areas of commitment do not justify inclusion of all of the territory in the UGB. There are several areas within the UGB that do not now receive sewer or water service or that receive only one service. The city's and LCDC's conclusion that the Priority 3 areas are committed (other than those hillsides that provide the scenic backdrop discussed below)[7] because *some* of them have the needed services is insufficient to support LCDC's conclusion of compliance. The fact that some, or even much, of the area may be committed based on the present or future availability of services does not, by itself, justify inclusion of the entire Priority 3 area. *See 1000 Friends of Oregon v. LCDC,* 69 Or App 717, 688 P2d 103 (1984). Each area must be committed, or it must be excluded from the UGB. Reasons supporting LCDC's conclusions must be stated clearly and with specificity. *See 1000 Friends of Oregon v. LCDC,* 73 Or App 350, 352-53, 698 P2d 1027 (1985). The city's statement that the question of sewer service has been resolved does not aid the Plan; only 96.4 acres are shown to be needed for the projected population.

The city has also chosen to include some steep hillsides within the UGB in order to provide a scenic backdrop to the downtown historic area. LCDC contends that those hillsides are needed to maintain the city's historic and aesthetic character.[8] The city has not complied with LCDC's continuance order requirement 3 to rezone the area for 10-acre

---

[7] Neither the city's nor LCDC's finding make it clear which areas on the map are the "scenic backdrops" and, therefore, are not among the areas stated to be committed on the basis of the level of services provided.

[8] In its response to 1000 Friend's objection to Goal 14 compliance, LCDC states that "1000 Friends has not demonstrated that exclusion of development from the hillsides is the only method to maintain the historic and aesthetic qualities of the hillsides." 1000 Friends does not have the burden of proof on the question of whether these lands belong within the UGB. *1000 Friends of Oregon v. LCDC.* 69 Or App 717, 729 n 12, 688 P2d 103 (1984).

sites. The city recognizes that those lands are not suitable for future urbanization. However, it contends that it is necessary to include those areas within the UGB and zone them for one-to-two acres minimum lot sizes in order to avoid a rural resource zone that could later be converted to an urban density of development. With respect to those areas, LCDC merely restates the city's arguments in its conclusion. LCDC acknowledged the Plan, concluding that the city's objective to prevent urbanization was proper.

Petitioners contend that the purpose of a UGB is to provide for future urbanization, not to prevent urbanization, and that therefore areas unsuitable for urbanization should be excluded from a UGB. LCDC answers that analysis of factors four and five of Goal 14, requiring consideration of efficiency of land uses within and on the fringes of the urban area, and analysis of the environmental, energy, economic and social consequences of inclusion, permit an interpretation of Goal 14 that allows land to be included to prevent urbanization. While those factors are important in determining which lands to include in a UGB, we conclude that LCDC erred. Goal 14 requires that

"Urban growth boundaries shall be established to identify and separate urbanizable land from rural land."

The Statewide Planning Goal Definitions define urbanizable land as:

"Urbanizable lands are those lands within the urban growth boundary and which are identified and

"(a)  Determined to be necessary and suitable for future urban uses

"(b)  Can be served by urban services and facilities

"(c)  Are needed for the expansion of an urban area."

The wooded hillsides have been determined to be unsuitable for future urban uses. The city and LCDC have not addressed provision of essential services to those areas. Services were only considered with respect to land that the city and LCDC found to be committed. The UGB contains more land than is needed for the projected expansion of the urban area. The city and LCDC have not shown that those areas are properly included in the UGB.

Reversed and remanded for reconsideration.