Argued and submitted January 14, reversed and remanded in part and affirmed in part
April 22, reconsideration allowed by opinion July 1, 1987
See 86 Or App 364, 738 P2d 1392 (1987)

1000 FRIENDS OF OREGON,
*Petitioner,*

*v.*

LAND CONSERVATION
AND DEVELOPMENT COMMISSION,
*Respondent.*

(85-ACK-76; CA A38601)

735 P2d 1295

Robert L. Liberty, Portland, argued the cause and filed the briefs for petitioner.

David G. Ellis, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Warden, Presiding Judge, and Van Hoomissen and Young, Judges.

WARDEN, P. J.

## WARDEN, P. J.

1000 Friends of Oregon (1000 Friends) seeks review of an order of the Land Conservation and Development Commission (LCDC) which acknowledged the Umatilla County Comprehensive Plan. 1000 Friends attacks the planning of several areas, all but one of which the county treats as committed exceptions to the requirements of the goals. We reverse in part and affirm in part.

The first two assignments of error concern areas which the county planned for heavy industrial use outside of urban growth boundaries (UGBs). The Hinkle-Feedville exception is 660 acres located south of the Hermiston UGB and west of the Stanfield UGB. It is immediately north of a major Union Pacific Railroad classification yard. The land is agricultural under the definition of Goal 3. The county justified the exception under the "reasons" criteria of ORS 197.732(1)(c).[1] The basis for the exception was that the county's industrial needs analysis showed a need for an additional 4300 to 5200 acres of industrial land and that the county had previously identified 4193 available acres. These 660 acres, therefore, would complete the county's industrial land inventory. The county discussed various factors showing that the location was suited to industrial use, emphasizing the site's transportation advantages. Other than suggesting a future expansion of the rail classification yard, the county did

---

[1] ORS 197.732(1)(c) provides:

"A local government may adopt an exception to a goal when:

"* * * * *

"(c) The following standards are met:

"(A) Reasons justify why the state policy embodied in the applicable goals should not apply;

"(B) Areas which do not require a new exception cannot reasonably accommodate the use;

"(C) The long term environmental, economic, social and energy consequences resulting from the use at the proposed site with measures designed to reduce adverse impacts are not significantly more adverse than what would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site; and

"(D) The proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts."

not indicate any specific industrial uses for the site. LCDC's evaluation simply summarized the county's analysis.[2]

1000 Friends attacks several aspects of the county's justification for the exception. The crucial weakness in the county's position is that its industrial needs analysis is fundamentally flawed. In determining how many acres it would need for industrial purposes, the county assumed that its *entire* work force would be employed in industry at the end of the planning period, although only 26 percent were so employed in 1976. As 1000 Friends points out, and as LCDC now accepts, there is actually a surplus of industrial land within existing UGBs and therefore no need to create additional areas.

■ LCDC argues that, despite that error, it correctly upheld the Hinkle-Feedville exception, because the county actually based it on locational rather than need factors. LCDC is incorrect. Although the county's analysis emphasizes locational factors, the supposed need for additional industrial land underlies its entire discussion. The county seeks to show that this exception is the correct place to provide the additional needed land; it does not show that locational factors alone support the entire exception regardless of need.[3] The county has not shown any uses, other than expansion of the rail classification yard, that require the site, nor has it shown how many of the 660 acres the railroad may need. Because it has adequate industrial land elsewhere, the exception has not been justified.

■ In its second assignment, 1000 Friends challenges the county's planning of 1400 acres near the McNary Dam for industrial use. The land is outside urban growth boundaries, but the county and LCDC do not treat it as an exception to the

---

[2] In reviewing an exception area, we are bound by the facts that the county found, if LCDC correctly held that there was substantial evidence to support them. ORS 197.732(6)(a); ORS 183.482(8). However, whether those facts show that the area is committed to non-resource use is a question of law. *1000 Friends v. LCDC,* 69 Or App 717, 722-723, 688 P2d 103 (1984).

[3] LCDC's argument might be better taken if the county had simply provided sufficient land for expansion of the rail classification yard. However, it asserted that much of the area was needed for future transportation-oriented industry, not for the railroad itself. The site's comparative advantage for that use is relevant only if the county needs additional transportation-dependent industrial land. Because of the error in the industrial needs assessment, the county has not shown that it does.

goals. There is substantial evidence to support the county's—and, by implication, LCDC's—finding that the area is primarily non-resource land. The county therefore did not need to consider Goal 3 or Goal 4 uses for the land. It and LCDC justify the failure to take an exception to Goal 14 on the ground that heavy industry is not an urban use and therefore need not be restricted to areas within a UGB. Urban use of the area, they say, can be prevented by prohibiting an urban level of services to it. *See 1000 Friends v. LCDC (Curry Co.),* 301 Or 447, 508-511, 724 P2d 268 (1986). The county clearly contemplates providing sufficient services for heavy industrial use on this land. Therefore, for the county's argument to be valid, heavy industry cannot be an urban use.

Both LCDC and LUBA have previously suggested that rural industrial or commercial use is a violation of Goal 14. *See 1000 Friends v. LCDC (Curry Co.), supra,* 301 Or at 507 n 37. The rule which LCDC adopted to explain the reasons exception states criteria which the county must address before it may approve an exception to the goals for rural industrial development. OAR 660-04-022(3). The rule applies to industrial use on rural resource lands; it does not specifically require the county to take an exception to Goal 14 to permit industrial use of rural non-resource land. However, the rule, previous LCDC policy and the very nature of industrialization suggest that industrial uses are urban uses. Because LCDC has not explicitly construed Goal 14 to the contrary, we cannot say whether such a construction would be sustainable. LCDC should explain whether heavy industry is an urban use. Because it has not done so, it has not explained why the facts lead it to the conclusion that industrial use of this land would not violate Goal 14. *See Home Plate, Inc. v. OLCC,* 20 Or App 188, 190, 530 P2d 862 (1975). LCDC must reconsider this decision on remand.

The third assignment of error attacks a number of "committed" exceptions for rural residential developments. ORS 197.732(1)(b).[4] The Westfield exception southwest of

---

[4] ORS 197.732(1)(b) provides:

"A local government may adopt an exception to a goal when:

"* * * * *

"(b) The land subject to the exception is irrevocably committed as described

Pendleton consists of nine lots, each of which is over four acres in size. The county approved the subdivision in 1979. In October, 1983, 1000 Friends employes took pictures of the area. Those pictures show it as undeveloped except for an oil mat road. In early 1984, LCDC denied the exception. The county then submitted further information, which LCDC again found inadequate. In a report on February 21, 1985, the LCDC staff suggested that the county might be able to justify the exception by providing more information on development before August, 1983. The county then found that there were underground electrical and telephone lines on the land, that one house had been built and that other lots had been sold. It also described in greater detail why the various developments committed the land to residential uses.

1000 Friends appears to accept that the current level of development would justify an exception. Its concern is that that development may be the result of efforts by the developer, possibly with encouragement from the county, to create commitment in order to justify an exception. Neither the county nor LCDC found when the various developments occurred; if they were after 1983 when, according to 1000 Friends, there was no development, 1000 Friends argues that it is impermissible to consider them.

■     1000 Friends is concerned that development might be used to justify itself. However, nothing in the record shows that that happened to this area. The major change between the county's submission in October, 1985, and its earlier statements was a significantly more detailed explanation of why the land's situation committed it to urban uses. That explanation emphasized the effect of the road in separating the area from cultivated lands to the east, the size of the area, which made it too small for commercial agriculture, and the divided ownerships. Those conditions all existed before October, 1983. The only developments which may have occurred after that date were the installation of underground telephone and electrical services and the building of a home on one lot.[5] We agree

by commission rule to uses not allowed by the applicable goal because existing adjacent uses and other relevant factors make uses allowed by the applicable goal impracticable[.]"

[5] There is no evidence of when the utilities were installed. The county states that the home was built in 1982, but the pictures 1000 Friends took in October, 1983, do not show it.

that the county has sufficiently explained why pre-October, 1983, developments show commitment. We therefore affirm LCDC's approval of the exception.

■      The Battle Mountain exception is south of Pilot Rock, and about one mile south of Battle Mountain State Park, in a hilly, forested region. 1000 Friends challenges parcels B and C, which are neighboring parcels of approximately 20 acres each. Both parcels have been used in the past for resource purposes, primarily grazing and logging, but neither is so used now. Adjacent land owners to the north and east currently use their property for summer sheep grazing. Parcel C is in common ownership with a larger resource parcel directly south of it, which had timber cut from it in the 1970's. The county justifies the exceptions on the ground that summer cabins to the west and a history of recreational use of the parcels makes continued resource use impracticable. Timber management practices such as spraying and slash burning would cause conflicts with the use of the cabins. Each parcel by itself is too small for grazing or productive timber management.

It is a close question whether the county has shown sufficient commitment to support this exception. LCDC points out that the legislature intended the "impracticable" standard of ORS 197.732(1)(b) to be less strict than the previous "not possible" standard. Impracticability, however, is not a loose concept. LCDC's rules provide that land divisions, such as those involved here, which were made without application of the goals do not by themselves demonstrate irrevocable commitment. "Only if existing development on the resulting parcels or other factors prevent their resource use or the resource use of nearby lands can the parcels be considered to be irrevocably committed." OAR 660-04-028(2)(c)(A). LCDC requires the county to treat contiguous undeveloped parcels under one ownership as single units. OAR 660-04-028(2)(c)(B). Finally, we have noted that conflicts with residential uses do not by themselves show commitment. "People who build houses in [a resource] area must expect some discomforts to accompany the perceived advantages of a rural location." *1000 Friends v. LCDC, supra* n 3, 69 Or App at 728.

We conclude that LCDC correctly decided that the

county has shown that parcel B is committed. It is in a separate ownership, is too small for resource use by itself and is generally closer to the cabins than is parcel C. The possibility of leasing it to a neighboring land owner for combined use with the neighbor's land is too speculative to require a different result. However, parcel C is in one ownership with the land to the south and is generally more removed from existing development than is parcel B. The county has not shown that it is committed.[6]

■ There are two exception areas along Mill Creek, near the Washington border east of Milton-Freewater. Those areas have been heavily developed for recreational use since early in this century. 1000 Friends attacks the exception with respect to one parcel in each area. Although the parcels primarily contain vacant land, the county has sufficiently shown that it is impracticable to use them for resource purposes, considering the heavy development and the marginal nature of the land. We therefore affirm LCDC's approval of those exceptions.

■ In contrast, the county gives only the barest information about parts of two parcels in the Tollgate recreational area in the Blue Mountains east of Pendleton. The remainder of those parcels is planned for forest use and adjoins other lands which are in active timber management. The county has not shown a level of conflicts with surrounding residences that justifies a finding that it is impracticable to apply the goals. To the extent that the county relied on the current use of these areas for riding, hiking, or mushroom hunting, it was incorrect. *See* n 6, *supra.*

■ The Landover Subdivision north of Hermiston was approved in the early 1970s, before the adoption of the goals. It is on sandy soils which are Class VII if not irrigated and Class IV if irrigated; the record indicates that irrigation water is not available. Letters from local farmers state that the soil is not suited to farming without irrigation and is poorly suited to irrigation. There are also power lines and roads which break up the area, making circle irrigation almost impossible. Many of the platted homesites have been sold, and the subdivision is

---

[6] The outdoor recreational use made of these parcels does not show commitment. That use is a forest use under Goal 4.

bordered on several sides by developed homesites. Although "[a] platted but undeveloped subdivision does not show commitment," *1000 Friends v. LCDC, supra,* 69 Or App at 731, in this case the situation as a whole supports the county's finding of commitment.

Finally,[7] 1000 Friends attacks the exceptions relating to several parcels on Tum-A-Lum Heights north of Milton-Freewater and immediately south of the Washington state line. The area was developed for rural residential use many years ago, and the parcels in question are in the midst of a number of established homes. Although those parcels are now or have recently been used for agricultural purposes, the record indicates that their productivity has been marginal. Two of the parcels are portions of larger parcels, each of which is in a common ownership with the challenged parcel; the remaining portions of those larger parcels are planned for exclusive farm use. The county's justification for dividing these parcels is that a bluff running through them creates a natural difference in the use of the different portions, with the portions at the higher level more appropriately designated for residential uses similar to that of other parcels at the same elevation. The county also emphasizes serious conflicts between agricultural and residential uses for all the questioned parcels.

■ 1000 Friends points out, in response to the county's arguments, that the parcels are now in agricultural use. How, it asks, can agricultural use be impracticable? Conflicts with the surrounding residences do not by themselves prove commitment, but they are relevant. Here the level of conflict, the extent of the residential development and the lack of *profitable* agricultural use of the parcels in recent years supports the county's decision as to all the parcels.[8]

Reversed on first and second assignments of error; on

---

[7] 1000 Friends' fifth, sixth and seventh assignments (there is no fourth assignment) raise the same issues as those involved in *Mill Creek Sportsmen's Assoc. v. LCDC,* 85 Or App 205, 735 P2d 1294 (1987). We reverse and remand on those assignments for the reasons stated in that case.

[8] The DeMott property, which is the least clearly committed parcel, has become infected with white rot, making continued growth of onions on it economically unfeasible. Onions are probably the most profitable agricultural use which might be made of the land, and this fact is significant in showing that agricultural use is impracticable.

third assignment of error reversed as to parcel C of Battle Mountain exception and as to Tollgate exception and otherwise affirmed; reversed on fifth, sixth, and seventh assignments of error; remanded for reconsideration.