Argued and submitted January 16, affirmed March 5, 1997

## 1000 FRIENDS OF OREGON,
*Petitioner,*

*v.*

## LAND CONSERVATION AND DEVELOPMENT COMMISSION,
*Respondent,*

*and*

## DESCHUTES COUNTY,
*Intervenor.*

(LUBA 93-PR/SUSTAIN-903; CA A82718)

934 P2d 601

F. Blair Batson argued the cause and filed the brief for petitioner.

John T. Bagg, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Bruce W. White argued the cause and filed the brief for intervenor.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

Petitioner 1000 Friends of Oregon (1000 Friends) seeks judicial review of an order that respondent Land Conservation and Development Commission (LCDC) issued on periodic review of intervenor Deschutes County's (the county) land use plans and regulations. In the challenged order,[1] LCDC determined that the county's plans and regulations complied with Goal 3 (Agricultural Lands) as to minimum lot sizes and farm dwellings. 1000 Friends argues that the method that the county used to determine minimum lot sizes is flawed and that the minimum sizes that it adopted are inadequate to ensure the continuance of existing commercial agricultural uses, which Goal 3 and the implementing rules require. We write to discuss two of 1000 Friends' arguments and affirm.

The county developed the challenged plans and regulations through an extensive process. It first created an inventory of commercial agricultural parcels in the county, based primarily on those tax lots that had farm deferral assessment, which requires current evidence of active agricultural use on the lot. It determined the ownership of each tax lot, treating contiguous lots in common ownership as one farm unit. The county deleted approximately 49 percent of the farm parcels, constituting 10 percent of the agricultural land, from the inventory because they were too small to be commercially viable. It then divided the county into seven subzones and evaluated lot sizes and agricultural uses in each. Except for one subzone, the primary factor in determining whether a parcel could be used for commercial agriculture was whether it was irrigated.[2]

In order to establish the appropriate minimum lot sizes in the subzones that depended on irrigated agriculture, the county first determined the lot with the median number

---

[1] After 1000 Friends filed its brief, LCDC withdrew its original order and subsequently issued an amended order. 1000 Friends then filed an amended petition for judicial review and a supplemental brief. We review the amended order.

[2] 1000 Friends does not criticize the minimum lot size in the subzone in which the county did not rely on irrigated acres.

of irrigated acres in the commercial agricultural parcels in each subzone.[3] Of necessity, half of all parcels in the subzone had fewer irrigated acres than the median parcel and half had more. By focusing on irrigated acres rather than total acres, the county emphasized actual agricultural uses on the parcels. The county then established the number of irrigated acres in the median parcel, or the number of unirrigated acres that was equal to the median parcel in assessed farm value, as the minimum parcel size in the particular subzone. It also conducted studies of land sales that led it to conclude that there were no "speculative effects"[4] on land prices in any subzone when the parcel was 23 acres or larger. In each subzone, the minimum lot size is at least 23 irrigated acres, and in all but one it is larger.

■  We first consider 1000 Friends' argument that the county erred by using tax lot data to determine the size of actual farms. 1000 Friends relies on our decision in *1000 Friends of Oregon v. LCDC (Lane Co.)*, 83 Or App 278, 731 P2d 457, *on recons* 85 Or App 619, 737 P2d 975 (1987), *aff'd in part and rev'd in part* 305 Or 384, 752 P2d 271 (1988), in which we held that Lane County's use of tax lot data to support its minimum lot sizes was inadequate to comply with Goal 3. In that case, we noted that Lane County had failed to show that tax lots reflected existing commercial agriculture. We held that, without information on how tax lots related to actual worked areas, tax lot data was insufficient for determining minimum lot sizes. We did not indicate that it was *never* acceptable to use tax lot data as part of determining the size of commercial agricultural parcels in a particular area. 83 Or App at 288-90.[5]

In our recent decision in *1000 Friends of Oregon v. LCDC*, 139 Or App 485, 912 P2d 919, *rev den* 323 Or 264

---

[3] Although irrigation was essential to most agricultural uses, some of the lots that the county included in its inventory and in determining the median parcel had no irrigated acres.

[4] By "speculative effects" on land prices the county appears to refer to prices that reflect possible uses of the land other than commercial agriculture, such as recreational homesites or hobby farms.

[5] In its decision, the Supreme Court agreed with our reasoning concerning the use of tax lot data. 305 Or at 406-07.

(1996), we rejected 1000 Friends' attack, based on the Lane County case, on Yamhill County's use of tax lot data in determining minimum forest lot sizes. Yamhill County had developed more information than had Lane County in the earlier case, including identifying specific ownerships of the tax lots and whether the lots received forest tax deferral assessments. In order for a lot to receive such an assessment, a county assessor had to determine that the parcel was in fact being used for forest purposes. Yamhill County's information, thus, was considerably greater than the information Lane County had. It did not rely solely on tax lot sizes.

The process that Deschutes County followed is similar to the process that Yamhill County used. Deschutes County treated tax lot data as a starting point for developing information about the actual use of the land, not as the sole basis for determining minimum lot sizes. It did not consider all lots within its exclusive farm use zones but only those that had a farm use tax assessment. The assessment data for those lots showed ownerships and actual agricultural use, including irrigated and unirrigated acres. The county checked the assessment information against other available sources concerning its agricultural resources. The sources of information that the county used together gave it a sufficient basis for determining the agricultural character of each subzone and the minimum sizes that were necessary to continue the existing commercial agricultural activities.[6] LCDC did not err in approving this process.

■ The other issue that requires discussion is 1000 Friends' attack on the county's use of the median lot in each subzone as the basis for determining the minimum lot size for that zone. By definition, half of the lots in each subzone are larger than the median, while half are smaller. 1000 Friends

---

[6] In its order LCDC noted that there is substantial evidence in the record that the damage that 1000 Friends claimed would result from the county's choice of minimum lot sizes would not in fact occur. As a result, LCDC found, it was unnecessary under the applicable rule to balance the positive and negative effects of those minimum sizes on commercial agricultural activities. *See* OAR 660-05-020(4). (Although LCDC has replaced this rule, the parties agree that it provides the basis for deciding the issues that 1000 Friends raises.) 1000 Friends does not challenge LCDC's action of merely finding that there is substantial evidence to support its factual findings rather than finding that those findings are correct.

argues that using the median gives excessive weight to relatively small lots at the expense of larger agricultural enterprises that are more likely to be economically viable and that contain a far higher proportion of the subzone's total agricultural land. It gives as an example the La Pine subzone, in which there are 17 parcels, four of which have no irrigated acres whatever. The median parcel has 37.43 irrigated acres, while six parcels have between 100 and 300 irrigated acres each. The use of the median produces a relatively small minimum lot size that is not necessarily related to the great majority of the actual agricultural activities in the subzone.[7] A minimum size based on the median parcel, thus, would permit larger parcels to be split into many smaller parcels, thus threatening to destroy the existing commercial agricultural activity.[8]

LCDC recognized these potential problems with reliance on the median parcel. It accepted the results that the county reached by applying its methodology but did not accept the methodology itself. In its order, LCDC noted that the Department of Land Conservation and Development

> "is concerned that, applied in a different county under different circumstances, the methodology (choosing the median-sized parcel) may allow the reduction of larger tracts into parcels too small for the larger scale agriculture in an area. Rather, the Department accepts the results of applying the methodology on the ground in Deschutes County. That is, it appears from review of the data that the county's minimum lot sizes will prevent the land base in each subarea from being divided into tracts too small to support the type of farming taking place in these areas. This means the new parcels can be used by farmers. This does not mean that parcels of this size can, by themselves, be separate farms."

---

[7] A more extreme example would be a hypothetical subzone that contained four parcels with 10 acres, one with 12 acres, and four with 500 acres. There would thus be 52 acres in five small holdings and 2000 acres in four large holdings. The median holding would be 12 acres, while the mean would be 228 acres. The minimum lot size would be based on holdings with only about 2.5 percent of the total agricultural land in the subzone.

[8] On the other hand, the 17 parcels have only 12 owners, suggesting that an actual farm unit may consist of a number of relatively small holdings rather than one larger holding.

It also pointed out that the use of the median size alone, without determining whether it will result in the creation of tracts below the size necessary to maintain the existing commercial agriculture, is not adequate under Goal 3.

LCDC accepted the minimum sizes in this case because it concluded from the record that, in these specific instances, they were adequate to maintain the existing commercial agriculture. It based that conclusion in part on evidence that the minimum sizes were too large to support prices based on nonagricultural uses. In addition, as LCDC suggested in its order and as the county emphasizes in its brief, under the current Goal 3 rule the creation of a new agricultural parcel does not in itself mean that the parcel will qualify for a farm dwelling. New farm dwellings must comply with the requirements of the new Goal 3 rule, which have their own minimum size provisions. *See* OAR 660-33-100; OAR 660-33-120(1); OAR 660-33-130. Allowing a division of an existing parcel into two new, smaller parcels, thus, will not necessarily permit the building of a new farm dwelling on either parcel.

The fact that it will be difficult to place a farm dwelling on a newly divided parcel makes it less likely that the division will change the actual use of the land. The smaller parcel may well fit into the existing pattern of larger farm units that consist of a number of noncontiguous parcels. That is what we take LCDC to have meant when it said that the new parcels can be used by farmers although they may not, by themselves, be farms. The strict limitations on new farm dwellings, thus, are an essential basis for LCDC's conclusion that the county's minimum lot sizes will not harm existing commercial agricultural activities. With that understanding, LCDC's approach is consistent with Goal 3 and the applicable rules. We therefore affirm its decision.

Affirmed.