Argued and submitted June 12, reversed and remanded to LUBA with instructions November 28, respondents' petition for reconsideration filed December 12, and petitioner's response filed December 19, allowed by opinion February 6, 2002
See 179 Or App 409 (2002)

Norm MAXWELL,
*Petitioner,*

*v.*

LANE COUNTY
and Darin Gorham,
*Respondents.*

2000-164; A114031

35 P3d 1128

Marianne Dugan argued the cause for petitioner. With her on the brief was Facaros & Dugan.

Stephen L. Vorhes argued the cause and filed the brief for respondent Lane County.

Corinne C. Sherton argued the cause for respondent Darin Gorham. With her on the brief was Johnson & Sherton, P.C.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

HASELTON, P. J.

**HASELTON, P. J.**

Petitioner Norm Maxwell seeks judicial review of an order of the Land Use Board of Appeals (LUBA), which affirmed a decision of the Lane County Board of Commissioners approving an application for rezoning of property totaling approximately 32 acres from Rural Residential, 10-acre-minimum parcel size (RR-10), to Rural Residential, 5-acre-minimum parcel size (RR-5).[1] *Maxwell v. Lane County*, 39 Or LUBA 556 (2001). We conclude that LUBA erred in determining that the county need not consider the legal status of applicant's parcels in connection with his application for rezoning and, consequently, we reverse.

The material facts are complex and, frankly, arcane. As we cannot improve upon LUBA's recitation of those facts, we reproduce it verbatim.

"The subject property is part of Exception Area 260B-1, for which a committed exception to Statewide Planning Goal 3 (Agricultural Lands) and 4 (Forest Lands) was taken in 1990. At that time Exception Area 260B-1 consisted of 11 parcels comprising approximately 105.13 acres. Exception Area 260B-1 was designated Rural Residential in the county's Rural Comprehensive Plan (RCP) and zoned RR-10. The present dispute centers on the western portion of Exception Area 260B-1, which in 1990 contained tax lots (TL) 601, 900 and 905. See Figure 1 below.[2] Whether that area now includes three or four parcels is the central dispute in this case.

"TL 900 and 905 were created by partition in 1945. TL 601, 900 and 905 are accessed by County Road 834 (Fire Road) and easements from that road. Fire Road was created in 1918 by dedication of easements to the county. The Fire Road right-of-way was subsequently improved to a point located just inside the eastern border of TL 905, where it comes to an apparent dead end. As dedicated, the Fire Road right-of-way continues westward, bisecting TL 905; however, that portion of Fire Road was never improved.

---

[1] As discussed in LUBA's statement of facts, the owners of the property included Darin Gorham ("applicant"), his wife Nicki Gorham, and his parents, Mark and Joyce Gorham.

[2] Figures 1 through 4 can be found in the Appendix to this opinion.

"In 1998 and 1999, a series of transactions occurred that radically altered the 1990 configurations of TL 601, 900 and 905, as described below.

## "A. Adjustment between TL 900 and 905

"In March 1998, Mark Gorham and Joyce Gorham purchased TL 900 and 905. On April 30, 1998, the Gorhams recorded a property line adjustment that left TL 900 entirely within the bounds of TL 905, and reduced it in size to two acres, surrounding an existing dwelling formerly on TL 905. See Figure 2. The property line adjustment increased TL 905 from 15.39 acres to 23.18 acres. TL 900 was then sold to a third party.

## "B. Division of TL 905 into 905A and 905B

"In May 1998, intervenor Darin Gorham and his wife Nicki Gorham purchased a half interest in TL 905. On June 1, 1998, the Gorhams submitted an application to the county to rezone that parcel from RR-10 to RR-5. On June 3, 1998, the county responded that the average parcel size in the exception area was too large to support a zone change to RR-5 pursuant to RCP Goal 2, Policy 11. In the meantime, intervenor applied for and received a legal lot verification for TL 905. Intervenor then applied for a partition of TL 905 into two parcels, 11 and 12.18 acres in size. The county gave tentative partition approval on September 28, 1998, with the condition that the final plat be recorded by September 28, 2000.

"However, the final partition plat was not recorded. Intervenor learned from the county surveyor's comments with respect to the partition plat that the Fire Road right-of-way continued west across TL 905 from its apparent dead end, and that the surveyor could find no evidence that the unimproved portion of Fire Road had ever been vacated. Intervenor also learned of an informal county policy of treating a parcel that is bisected by a public right-of-way as two separate parcels. Rather than finalize the partition plat, intervenor sought a legal lot verification determining that the 3.5-acre portion of TL 905 north of Fire Road was a separate parcel (henceforth TL 905B). On April 21, 1999, the county issued a legal lot verification to that effect. On December 8, 1999, the county issued a legal lot verification for the 18-acre portion of TL 905 south of Fire Road (henceforth TL 905A). See Figure 3, below.

**"C.   Adjustment between Lots 601 and 905B**

"On April 22, 1999, Mark Gorham purchased TL 601, which adjoined TL 905B to the north. TL 601 was 12.13 acres in size, and contained an existing dwelling in its eastern portion. On June 15, 1999, the Gorhams recorded a property line adjustment that reduced TL 601 to two acres, including the existing dwelling. The result was to increase TL 905B from 3.5 acres to 13.66 acres. TL 905B was then deeded to Mark Gorham. The county issued legal lot verifications for TL 601 and TL 905B on July 22 and 23, 1999. On August 10, 1999, TL 601 was sold to third parties. On November 26, 1999, Mark Gorham obtained county approval to site a mobile home on TL 905B. The relevant parcels had now taken on their current configuration. See Figure 4.

"On December 17, 1999, intervenor submitted a revised zone change application for TL 905A and 905B, an area totaling 31.68 acres. A hearings officer held a public hearing on January 27, 2000, and closed the evidentiary record on February 7, 2000. On March 9, 2000, the hearings officer issued a decision denying the rezone on the grounds that TL 905A and 905B were not properly viewed as separate parcels and, without viewing them as separate parcels, the average parcel density within the entire exception area still exceeded 7.5 acres per parcel. Intervenor and the county planning director both requested reconsideration. The hearings office granted reconsideration and reopened the record until June 16, 2000. On July 26, 2000, the hearings officer issued a decision approving the requested rezone to RR-5, incorporating his March 9, 2000 decision except as *expressly modified or supplemented.* Petitioner appealed the hearings officer's decision to the board of commissioners. On September 13, 2000, the board of commissioners issued an order declining to hold a new hearing and affirming the hearings officer's decision. This appeal followed." *Maxwell v. Lane County,* 39 Or LUBA at 557-61 (footnotes omitted; boldface in original).

As pertinent here, in his appeal to LUBA, petitioner argued that the county erroneously based its calculation regarding the average lot size within Exception Area 260B-1 on a total area size of 103.5 acres. He also argued that the county erred in determining that petitioner could not challenge, or that the county could not consider, the partition of

tax lot 905 into tax lots 905A and 905B, the property line adjustment between tax lot 900 and tax lot 905, and the property line adjustment between tax lot 905B and tax lot 601. Finally, petitioner argued that the county's findings regarding sewage, water supply, access, natural hazards, and effect on resource lands were not supported by substantial evidence in the record.

In affirming the county's decision, LUBA first concluded that petitioner had failed to raise the issue relating to the total size of Exception Area 260B-1 before the close of the evidentiary hearing and that petitioner therefore had waived that issue. *Maxwell*, 39 Or LUBA at 562-63. LUBA also determined, consistently with *McKay Creek Valley Assn. v. Washington County*, 118 Or App 543, 848 P2d 624, *rev den* 317 Or 272 (1993), that where the applicable county ordinance relating to rezoning—the county's Policy 11—"does not expressly require determination of the legal status of tax lots 905A and 905B, that question need not be considered in connection with the county's proceedings under Policy 11." *Maxwell*, 39 Or LUBA at 565-69. LUBA determined that petitioner's arguments regarding the property line adjustments between tax lot 900 and tax lot 905 and between tax lot 905B and tax lot 601 did not provide any basis for reversal or remand of the county's decision. LUBA so reasoned because petitioner had failed to identify any manner in which those actions affected the total number of parcels factored into the calculation of average parcel size within the exception area. *Id.* at 569-70. Finally, LUBA determined that the county's findings regarding sewage and other requirements were supported by substantial evidence in the record. *Id.* at 570-73.

On review, petitioner essentially reiterates his arguments made before LUBA. We begin with his first assignment of error in this court, in which he asserts that LUBA erred in concluding that the county was not required to determine whether the partition of tax lot 905 resulted in two "legal lots" prior to factoring those lots into its calculation of average parcel size within the exception area. As before LUBA, the meaning of our decision in *McKay Creek* is central to petitioner's argument—and to applicant's and the county's response. Petitioner asserts that an inquiry into the legal

status of the lots would not constitute an impermissible "collateral" attack because, unlike in *McKay Creek*, the sizes and number of lots or parcels in the exception area constitute the "very core" of the county's computational determination whether the exception area can be rezoned. According to petitioner, the lots or parcels therefore necessarily must be legal lots, notwithstanding the language of the rezoning provision;[3] to conclude otherwise would contravene ORS chapter 92, applicable statewide land use planning goals, and Land Conservation and Development Commission (LCDC) rules; and the requirements in those provisions cannot be waived by the county. Petitioner also argues that, to the extent that applicant relied on the recordation of deeds for tax lots 905A and 905B, recordation under those circumstances was an "invalid, void" action. In that regard, petitioner argues that, as a factual matter, there is no road dividing applicant's parcel and that, even if there were, as a matter of law the road would not automatically create a partition; according to petitioner, the extra lot created by the partition of tax lot 905 into lots 905A and 905B therefore was not a legal lot. Finally, petitioner argues that, as a policy matter, the county's and LUBA's decisions in this case allow developers to circumvent the criteria for rezoning by permitting the unlawful partitioning of parcels until such density is achieved as would support rezoning.

In response, applicant (and the county) offer a battery of interrelated arguments. First, under *McKay Creek*, unless an applicable local ordinance expressly makes the legality of the subject unit of property a requirement or

---

[3] Petitioner relies in part on *Higgins v. Marion County*, 142 Or App 418, 921 P2d 413, *rev den* 324 Or 229 (1996). There, the county granted a lot line adjustment as between two lots that ostensibly had been earlier partitioned from a 96-acre "parent parcel" and granted a permit for primary dwelling on one of the resulting parcels. LUBA reversed, concluding, "apparently as a matter of law," that the 96-acre parcel "had never been lawfully partitioned." *Id.* at 420. We originally affirmed without opinion. The petitioners moved for reconsideration, asserting that the proper disposition was for LUBA to remand to the county for further findings as to the partitioning of the parcel. We declined to do so, reasoning that the proceeding before us was not a partitioning proceeding and that nothing in the record contradicted either LUBA's conclusion that an "antecedent partition was a condition precedent" to the granting of the lot line adjustment and dwelling permit, or its conclusion that such partition had not occurred. *Id.*

criterion for approval of a land use decision, a local government need not determine the property's legality.[4] Second, neither of the applicable enactments here—Lane County Rural Comprehensive Plan (RCP) Goal 2, Policy 11, and the interpretation of that ordinance stated in Lane County Board of Commissioners Order 88-2-10-14—expressly requires an inquiry into the legality of lots or parcels used in calculating land use densities for exception areas. Third, because other Lane County legislation uses and defines the term "legal lots," this court should conclude that the lack of such terminology in Goal 2, Policy 11, and Order 88-2-10-14 demonstrates that such an inquiry is not required under those enactments. Fourth, under *Clark v. Jackson County*, 313 Or 508, 836 P2d 710 (1992), the county's interpretation of Goal 2, Policy 11, in Order 88-2-10-14 must be affirmed, because it is not "clearly wrong" or contrary to any state statute, land use goal or rule. Finally, as a factual matter, there is a road bisecting tax lot 905 that was not vacated by the establishment of another road. Applicant argues that, for all of those reasons, the county properly calculated the density of the exception area and properly granted his application for rezoning without considering the legality of the partition of tax lot 905 into lots 905A and 905B.

As noted, *McKay Creek* is central to the parties' dispute and LUBA's disposition. Thus, we begin by examining that and other cases addressing the so-called "legal lot" issue.

In *Yamhill County v. Ludwick*, 294 Or 778, 663 P2d 398 (1983), property within a 40-acre-minimum forest zone was subdivided or partitioned and sold to individual owners. The county later granted permits and variances permitting the construction of a single-family dwelling on a 4.7-acre parcel and on a 5-acre parcel. Neighboring property owners appealed the county's decision granting the permits and variances to LUBA, contending that the county had, in effect, rezoned the area without a proper rezoning procedure. LUBA

---

[4] We note that, in a letter dated June 3, 1998, an associate planner in the Land Management Division of the Lane County Public Works Department advised applicant's agent that "legal lot verification" be completed in regard to tax lot 905, because "proof of legal lot status is needed before a rezoning application can be considered * * *."

reversed the county's decision, on the ground that the lots were not "existing legal lots of record" as provided in the applicable county zoning ordinance. *Yamhill County v. Ludwick*, 3 Or LUBA 271 (1981). The county sought judicial review, and we reversed, concluding that an "existing legal lot of record" meant merely a legally recorded conveyance of a parcel. *Yamhill County v. Ludwick*, 57 Or App 764, 646 P2d 1349 (1982).

The Supreme Court reversed our decision. As pertinent here, the court concluded that the original subdivision or partition of the land had occurred in violation of ORS chapter 92 and that, consequently, the tracts were not "existing legal lots of record" as required by the applicable zoning ordinance. *Ludwick*, 294 Or at 788. The court reasoned that, although it did not know Yamhill County's "legislative intent" in referring to "existing legal lots of record" in the ordinance, it "seem[ed] logical" that the county intended to identify and avoid potential site-related problems prior to subdivision, rather than having to address such problems at some later time when owners sought permits and variances. *Id.* at 789. That conclusion was not dependent on whether the sales of the tracts to the owners were void or voidable under contract law. *Id.* at 789-90. Rather, the court was concerned "only with the legal status of the lots for the purpose of land use planning." *Id.* at 790.

Ten years after *Ludwick*, we decided *McKay Creek*. There, Washington County formerly, and erroneously, had interpreted its community development code and ORS chapter 92 "to allow new parcels to be created by recording deeds or land sale contracts separately conveying portions of an existing parcel that were separated by a public road, without additional county review." *McKay Creek*, 118 Or App at 545. In addition, a county zoning ordinance permitted a dwelling in conjunction with farm use in an exclusive farm use (EFU) zone if the dwelling was located "on a lot or parcel" that was operated for certain agricultural or forestry purposes. *Id.* The county approved a dwelling under the ordinance. An association appealed to LUBA, arguing that the subject property did not qualify as a "lot or parcel" for the purpose of the ordinance because it had been unlawfully created under the erroneous prior county policy. Relying on *Ludwick*, LUBA held

that the circumstances in which the substantive correctness of prior actions creating a lot or parcel could be collaterally attacked were quite limited: A collateral attack in a subsequent land use proceeding involving the same parcel was cognizable only when the applicable local ordinance at issue in the current proceeding "specifically require[d] a determination that a lot or parcel was 'legally' created." *McKay Creek Valley Assn. v. Washington County*, 24 Or LUBA 187 (1992). LUBA concluded that the dwelling permit ordinance at issue did not require such a determination and that, consequently, the association's collateral attack was not cognizable. *Id.*

On judicial review, we noted that the term "parcel" was defined in the Washington County code; that the definition "paralleled" the equivalent definition in ORS chapter 215; and that the county definition "specified the ways in which parcels may be created and enumerates the sources of the approval criteria that apply to them." *McKay Creek,* 118 Or App at 545. We concluded that, nevertheless, in the dwelling permit proceeding at issue, the county was not required to determine the legality of the relevant parcel. We reasoned:

"The problem here is not whether [the subject] property is a lawfully created lot or parcel, but whether that question must be *considered* in connection with this application [for a permit]. [The Yamhill County ordinance at issue in *Ludwick*] expressly made the legality of the lots an approval criterion for allowing the use on them that the applicants sought. That is not the case here. *We do not read the* Ludwick *principle as applying in situations where applicable legislation does not make the permissibility of the use subsequently applied for dependent on the correctness of earlier decisions and actions affecting the status of the property.* In other words, our understanding of *Ludwick* is that it construes a particular ordinance; it does not establish a general rule whereby every application for a use of land would necessitate a redetermination of the permissibility of every other use that has taken place on the land.

"For similar reasons, this case is unlike *Woosley v. Marion County*, 118 Or App 206, 846 P2d 1170 (1993), where LUBA and we affirmed the county's denial of an application for a replacement dwelling on property that, earlier, had been unlawfully partitioned. The basis for that decision was county legislation that forbade land use

approvals on property that was in violation of any ordinance of the county. No argument is made that there is corresponding legislation that bears on this application.

"LUBA drew a distinction here between prior government approvals and the substantive correctness of those approvals, and indicated that the existence of the former could be re-explored in connection with subsequent applications, while the latter question could not be. The property in question passes the test that LUBA deemed applicable. Therefore, it is unnecessary for us to decide whether, in the absence of *state or local legislation that mandates it in connection with particular applications*, even the level of reexamination of earlier actions embodied in that test is appropriate as a general rule. We hold that the legality of the status of respondents' property as a lot or parcel did not have to be determined here and, therefore, we reject petitioner's assignment."

*Id.* at 548-49 (emphasis added; original emphasis is deleted).[5]

Our most recent "legal lot" case was *Marshall v. City of Yachats,* 158 Or App 151, 973 P2d 374, *rev den* 328 Or 594 (1999). There, the petitioners challenged the city's approval of a dwelling permit, asserting, in part, that an earlier partitioning of the lot had been unlawful. In rejecting that challenge, we emphasized that the petitioners had "point[ed] to nothing in the city's legislation that require[d] a legal lot of record as a prerequisite to the granting of a dwelling permit." 158 Or App at 157. We concluded that, consistently with *McKay Creek,* "in the absence of such a requirement, both the legality of the [prior] partitioning and the merits of [the] petitioners' collateral attack on it are inconsequential to [the court's] review of the city's decision to issue the permit." *Id.*

■ Reduced to their essence, the described cases establish that a local government entity must determine the legal status of a lot or parcel "in connection with" a current proceeding involving the parcel if required to do so by "applicable

---

[5] Judge Durham dissented. As had the majority, he noted that, although the applicable Washington County ordinance did not expressly use the word "legal," it defined the terms "lots" and "parcels" and those definitions referred to other ordinances specifying requirements for the creation of lots and parcels. He reasoned that, "given that context," the ordinance at issue therefore must be construed to mean lawfully created lots or parcels. *Id.* at 549 (Durham, J., dissenting).

legislation." *See McKay Creek*, 118 Or App at 548. That much is clear, and we do not revisit that basic holding. Nevertheless, we believe that the cases lack clarity as to two important subsidiary principles. First, although the Supreme Court in *Ludwick* based its decision on the fact that the ordinance in that case expressly required a legal lot, and we in *McKay Creek* and *Marshall* pointed to the *absence* of an express requirement, *Ludwick* did not hold that an inquiry into the legality of a lot can be triggered *only* by an express requirement to that effect.

Second, and equally significantly, none of the described cases provides a satisfactory answer to the question of what legislation properly is deemed "applicable." Again, in *Ludwick*, the particular county ordinance governing the particular proceeding at issue expressly required consideration of the parcel's legal status; accordingly, the court was not called upon to look further afield. In *McKay Creek*, although other local ordinances may have (and, for the dissent, did) shed light on the question, we apparently based our analysis entirely on the ordinance governing dwelling permit proceedings. *See McKay Creek*, 118 Or App at 545. In *Marshall*, relying on *McKay Creek*, we also addressed only the ordinance governing the particular proceeding at issue. *Marshall*, 158 Or App at 153, 157.

Our (at least implicitly) narrow definition and identification of "applicable" legislation in *McKay Creek* antedated *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993).[6] At the first level of the *PGE* analysis, the court looks not only to the text of the particular legislative enactment at issue, but also, concomitantly, to the enactment's context, including (as pertinent here) other provisions of the same enactment, related enactments, and the historical context of the relevant enactments. *Id.*; *see also Plotkin v. Washington County*, 165 Or App 246, 250, 997 P2d 226 (2000) (explaining that, under *PGE*, both text and context are pertinent to the first level of analysis; examining the

---

[6] The *PGE* methodology of statutory construction applies to local government legislation. *Eduardo v. Clatsop Community Resource*, 168 Or App 383, 387, 4 P3d 83 (2000) (citing *Harris v. Sanders*, 142 Or App 126, 130, 919 P2d 512, *rev den* 324 Or 322 (1996)).

context of a county code provision before examining its text, because the context "provide[d] perspective on the text"). Given *PGE*, it is unremarkable that, in determining whether a local government must consider the legal status of a parcel "in connection with" a current proceeding involving the parcel, the local government must consider not only the particular ordinance that governs the current proceeding, but also must identify and construe the ordinance in light of any other relevant, applicable legislative enactment. Also consistently with *PGE*, even if the text of a local ordinance does not explicitly and unambiguously require the local government to consider the parcel's legal status, such a requirement may, if sufficiently supported, be derived from the "text in context."

■ We turn to the legislation at issue here. Again, the particular enactments relating to zoning and rezoning include the county's RCP Goal 2, Policy 11, and its implementing Order 88-2-10-14. Goal 2, Policy 11, provides:

"Land use designations and densities appropriate for developed and committed [*i.e.*, exception] areas shall be determined through compliance with other plan policies and the following criteria:

"a. A Rural Residential designation shall be applied to lands which are devoted to rural housing uses as evaluated by the following criteria:

"i.   existing development pattern and density;

"ii.   on-site sewage disposal suitability, or community sewerage;

"iii.   domestic water supply availability;

"iv.   access;

"v.   public services;

"vi.   lack of natural hazards;

"vii.   effect on resource lands.

"Densities of 1, 2, 5 or 10 acres shall be applied to represent existing development patterns and to limit problems resulting from a negative evaluation of any of the above criteria."

By its terms, Goal 2, Policy 11, neither expressly refers to nor sets out any express requirements relating to "lots" or "parcels." It does, however, expressly provide in part, that "[l]and use designations and densities appropriate for developed and committed areas shall be determined through compliance with other plan policies" and with "existing development pattern[s] and density," among other criteria. Moreover, nothing in Goal 2, Policy 11, limits the extent of, or sets out any exceptions to, the required compliance with those policies and criteria or otherwise expressly exempts parcels subject to zoning or rezoning from other applicable legislation. Goal 2, Policy 11, therefore suggests that, at a minimum, zoning decisions must be made in a manner that is consistent with the requirements of other local land use legislation.

Next, Order 88-2-10-14 sets out three "policy interpretations" applicable to Goal 2, Policy 11. Policy Interpretation #1 defines the term "existing development patterns" as used in that policy and explains how those patterns should be determined in evaluating a rezoning request for a residential area, including "identification" of the "average parcel size or parcel density" of the existing development. Policy Interpretation #2 provides that, in determining whether a "proposed residential density is consistent with the Goal 2 Policy 11 requirements that the proposed density 'shall be applied to represent existing development patterns,'" the county shall perform a "mathematical computation" to determine "the existing, average residential parcel size[ ]." In explaining the computation, the "policy interpretation" explains:

> "This interpretation provides direction for making the determination that a [proposed] residential density would be consistent with the existing development pattern of an exception area. It doesn't change this existing consistency requirement. Areas where the existing, average residential parcel sizes correspond closely to the minimum parcel sizes of the applied RR zoning would not meet this consistency requirement if RR zoning having smaller minimum parcel sizes would be proposed - development in these areas would be limited to infilling of vacant parcels and redivision of a smaller number of parcels which are untypically large for the exception areas. Once parcels in an exception area are divided, this has the effect of lowering the existing average

parcel size of the [exception] area, and at some point in time, may significantly change the average parcel size of the exception area to the extent that a rezoning to an RR zone with a smaller minimum parcel size could be found in compliance with this policy requirement. The exception areas where residential rezoning to allow smaller minimum parcel sizes could likely be found in compliance with this policy requirement are those exception areas where the RR zoning minimum parcel sizes are not the ones most representative of the existing development patterns."[7]

Policy Interpretation #3 discusses ways in which the county determines whether a proposed residential density "limit[s] problems resulting from a negative impact" of the criteria listed in the Goal, including identification of potential "compatibility problems" and possible "mitigation measures."

By its terms, each of the described policy interpretations expressly provides that the determination whether an exception area should be rezoned shall be made on the basis of a computation involving "parcels." Thus, the relevant unit of land for purposes of a rezoning proceeding is a "parcel," not a "lot" or a "legal lot." However, none of the policy interpretations set out in Order 88-2-10-14 defines the term "parcels," establishes any requirements relating to parcels, or incorporates the definition of, or requirements relating to, parcels found in any other source of law. Nevertheless, it is significant that the second policy interpretation expressly recognizes the role that "division" of parcels can have on future rezoning decisions. On balance, Order 88-2-10-14, considered together with Goal 2, Policy 11, suggests that zoning and rezoning decisions must be made in a manner that is consistent with other requirements of local land use legislation pertaining to "parcels," including legislation relating to the "division" of parcels.

We turn, then, as context, to local enactments pertaining to "parcels" and the "division" of parcels. Two such enactments are Lane County Code (LC) chapter 13, captioned "LAND DIVISIONS," and LC chapter 16, setting out

---

[7] As discussed below, definitions of terms in Lane County Code 16.090 provide part of the context of Order 88-2-10-14. LC 16.090 does not define the term "divide" or the term "division." We understand it to refer to either "partitioning" or "subdividing" of land, each of which is discussed below.

the "LANE COUNTY LAND USE AND DEVELOPMENT CODE."[8] As pertinent here, LC 16.300 provides that LC chapter 13 "is the procedure for partitioning and subdividing lands under the jurisdiction of the [RCP]," except that "[a]bbreviations, terms, phrases, words and their derivatives shall be construed as specified in LC 16.090 instead of LC 13.010." Pertinent "constructions"—in effect, definitions—include LC 16.090, which provides, in part, that a "parcel":

"Includes a unit of land created:

"(a)  by partitioning land as defined in LC 16.090[; or]

"(b)  in compliance with all applicable planning, zoning, and partitioning ordinances and regulations[.]"

LC 16.090 provides that a "partition" is "[e]ither an act of partitioning land or an area or tract of land partitioned." As pertinent here, LC 16.090 provides that to "partition land" means:

"To divide land into two or three parcels of land within a calendar year, but does not include:

"* * * * *

"(b)  an adjustment of a property line by the relocation of a common boundary where an additional unit of land is not created and where the existing unit of land reduced in size by the adjustment complies with any applicable zoning ordinance."[9]

LC 13.005 provides, in part:

"<u>Purpose.</u> Pursuant to ORS chs 92, 197, and 215, any person desiring to partition * * * land within any part of Lane County outside of incorporated cities shall submit preliminary plans and final plats for such partitions * * * to the Director [of the Planning Division] for review."

---

[8] After oral argument in this case, we requested that the parties submit supplemental briefing on applicable related local legislation, if any, and that they provide us with copies of such legislation. After receiving the parties' supplemental briefs, including a copy of LC chapter 16, we separately requested that Lane County provide us with LC chapter 13, of which we now take judicial notice.

[9] By contrast, a "lot" is a "unit of land that is created by a subdivision of land"; to subdivide land is to "divide an area or tract of land into four or more lots within a calendar year." LC 16.090.

LC 13.050 provides, in part:

> "General Requirements and Standards of Design and Development for Preliminary Plans. The following are the requirements to which the preliminary plan of a * * * partition must conform:
>
> "(1)  Conformity with the Comprehensive Plan. All divisions shall conform with the Comprehensive Plan for Lane County * * *.
>
> "* * * * *
>
> "(2)  Conformity with the Zoning. All divisions shall comply with all specifications of the applicable zoning requirements in Lane Code, including uses of land, area and dimension requirements, * * * and other requirements as may be set forth."

LC 13.100 provides, in part:

> "Application Requirements for Preliminary Partition Plans.
>
> "(1)  An application for preliminary partition approval shall be filed with the Department * * *."

LC 13.120 provides, in part:

> "Criteria for Approval of Preliminary Plans. A decision of the preliminary plan shall be subject to Director approval * * *." (Underscoring in original.)

Also as pertinent here, LC 13.300 sets out application requirements for final partition plats; LC 13.310 sets our criteria for approval of final partition plans; LC 13.320 sets out final partition map requirements; and LC 13.400 provides for amendments to preliminary plans. Finally, "[i]n addition to, and not in lieu of any other enforcement mechanism authorized by Lane Code," LC 13.700(1), LC 13.700 provides for enforcement of LC chapter 13 by means of civil penalties, equitable relief, and, "[w]henever the Director determines that property has been partitioned * * * in a manner contrary to any of the provisions of this chapter," the preparation and recording of a report to that effect, including "a statement that no building permits will be issued for the described property[.]" LC 13.700(3).

In summary, under LC chapter 13 and the incorporated "constructions" provided in LC 16.090, a "parcel" is a tract of land created by "partitioning" or in compliance with "all applicable planning, zoning, and partitioning ordinances and regulations." In turn, "partitioning" of land is an expressly defined process involving specified requirements for the creation of "parcels," one of which is that preliminary partition plats comply with zoning ordinances.

By their terms, and considered as context to Goal 2, Policy 11, and Order 88-2-10-14, those provisions not only inform us of the precise legal meaning of the term "parcel" for the purpose of LC chapter 13—namely, a tract of land created according to the procedural and substantive requirements of that chapter. They also suggest that that meaning is applicable in the context of zoning and other land use proceedings as well. Stated another way, where each of the cited and quoted enactments recognizes and gives effect to related enactments and the requirements established therein, it is logical to conclude that the terms used have the same meaning throughout those related enactments. *Cf. PGE*, 317 Or at 611 (where the legislature uses the same term in related statutes, court infers that the term has same meaning); *Kahn v. Pony Express Courier Corp.*, 173 Or App 127, 141, 20 P3d 837, *rev den* 332 Or 518 (2001) (same).

Accordingly, we conclude that, although neither Goal 2, Policy 11, nor Order 88-2-10-14 expressly defines the term "parcel" or sets out any requirements relating to parcels, nevertheless, the definition of "parcel" provided in LC 16.090 and incorporated in LC chapter 13, and the requirements pertaining to the creation of parcels set out in LC chapter 13, are applicable in the context of a rezoning proceeding under Goal 2, Policy 11, and Order 88-2-10-14. Thus, a computation of "average existing parcel size" or "parcel density" for the purpose of deciding an application for rezoning must be conducted using "parcels" that conform to the meaning of, and requirements relating to, that term in LC chapter 13. The county and LUBA erred in concluding otherwise.

Applicant's arguments to the contrary are unavailing. As noted, 178 Or App at 216-17, applicant argues that: (1) the county's definition of the term "legal lot" in LC 16.090

and its use of that term in LC 16.231(2)(a) and (b) indicate that the county knows how to require a legal lot; (2) the county did not do so in Goal 2, Policy 11, or Order 88-2-10-14; and, consequently, (3) we should infer that Goal 2, Policy 11, and Order 88-2-10-14 do not require the county to determine the legality of lots or parcels in a rezoning proceeding.[10] Applicant's argument, in effect, concedes that the provisions of Lane Code are appropriate context for Goal 2, Policy 11, and Order 88-2-10-14. As discussed above, the relevant unit of land for purpose of a rezoning proceeding as described in Order 88-10-2-14 is a "parcel." Under Lane Code, the term "parcel" means a unit of land created by partitioning land in compliance with LC chapter 13. *Cf. State v. Emmich*, 34 Or App 945, 580 P2d 570 (1978) (affirming conviction under ORS 92.990 for violation of ORS 92.325, prohibiting sale of land subdivided in contravention of applicable provisions of ORS chapter 92). The fact that LC 16.090 also defines the term "legal lot" therefore does not assist applicant.

Applicant also argues that Order 88-2-10-14 constitutes a local interpretation of the county's Goal 2, Policy 11, to which LUBA and this court must defer under ORS 197.829(1) and *Clark*. As pertinent here, under ORS 197.829(1)(a)-(c), LUBA is required to affirm a local governing body's interpretation of its land use regulation unless LUBA determines that the interpretation is inconsistent with the express language of the regulation or its underlying purpose or policy. Similarly, under *Clark*, in reviewing a county's land use decision, the reviewing tribunal must affirm the county's interpretation of its own ordinance unless it determines that the county's interpretation is inconsistent with the express language of the ordinance, its context, or its apparent purpose or policy. 313 Or at 514-15.

Here, however, Order 88-2-10-14 neither expressly nor implicitly purports to interpret the term "parcels" for the purpose of Goal 2, Policy 11. Rather, the order purports to

---

[10] LC chapter 16 pertains to Rural Residential uses; section LC 16.231(2)(a) provides that uses and activities permitted in those zones include "[o]ne single-family dwelling, mobile home, or duplex on a *legal lot*." (Emphasis added.) LC 16.090 defines "legal lot" as a "lawfully created lot or parcel."

explain the meaning of the phrase "existing development patterns" and to establish the proper computational method for determining the existing parcel density of an area. In accomplishing those purposes, the order merely uses the term "parcel" without defining or qualifying it in any way. In that circumstance, the county's purported interpretation, if not entirely lacking, is "inadequate for review," ORS 197.829(2), and LUBA and, in turn, this court "may interpret the legislation *ab initio* and independently, as part of the process of reviewing the local government's decision." *Alliance for Responsible Land Use v. Deschutes Cty.*, 149 Or App 259, 265, 942 P2d 836 (1997), *rev dismissed as improvidently allowed* 327 Or 555 (1998). In short, "there is no local interpretation to which deference can be accorded."[11] *Id.*; *see also Mountain West Investment Corp. v. City of Silverton*, 175 Or App 556, 559-66, 30 P3d 420 (2001) (analyzing text and context of applicable ordinance to determine whether LUBA's decision regarding the proper application of the ordinance was "unlawful in substance" under ORS 197.850(9)(a)).

We emphasize that our conclusion in this case—that a computation of "average existing parcel size" or "parcel density" for the purpose of deciding an application for rezoning under Lane County's Goal 2, Policy 11, and Order 88-2-10-14 must be conducted using "parcels" that conform to the meaning of, and requirements relating to, that term in LC chapter 13—does not mean that local governments always and automatically must determine the legal status of units of land in connection with current proceedings involving those units of land. Rather, as the above analysis indicates, whether a local government must do so depends on the issues raised in, and the particular local enactment relating to, the current proceeding. In addition, some land use decisions may be based on property characteristics or property units other than "lots"

---

[11] We also note that, even assuming that Lane County's interpretation of the term "parcel" in Order 88-2-10-14 was inferrable from the manner in which it applied the order in this rezoning proceeding and therefore was adequate for review under the deferential standard of review set out in *Clark*, *see Alliance for Responsible Land Use*, 149 Or App at 266-67 (so determining in regard to the ordinance at issue in that case), it nevertheless is questionable whether the county's interpretation was consistent with the express language of the ordinance in its context—particularly, as discussed above, the meaning of the term "parcel" in LC chapters 13 and 16.

or "parcels." As long as no conflict with other applicable law or standard is created, some local government land use decisions might utilize any of a broad spectrum of other data about land uses and ownership patterns, rather than, as here, legal parcelization. *See, e.g., 1000 Friends of Oregon v. LCDC*, 146 Or App 558, 934 P2d 601 (1997), *rev den* 326 Or 389 (1998) (Deschutes County made use of certain tax lot data, along with other information, in determining appropriate minimum lot sizes). Additionally, local ordinance procedural rules, as well as the statutes governing LUBA's review jurisdiction, should be adequate to protect the finality of decisions involving lots and parcels against challenges in the form of collateral attacks.[12]

In summary, a local government entity must determine the legal status of a unit of land in connection with a current proceeding involving that unit of land if required to do so by applicable legislation. Applicable legislation includes not only the local enactment governing the particular proceeding at issue, but also other related enactments. In addition, the requirement that the local government determine the legal status of a unit of land in connection with a particular proceeding need not be expressly stated in the relevant enactment, but may be derived from its text in context or by consideration of its purpose or policy. To the extent that *McKay Creek* holds otherwise, we now disavow it.

It follows that LUBA erred in concluding that, under *McKay Creek*, because Goal 2, Policy 11, did not itself expressly require determination of the legal status of applicant's tax lots 905A and 905B, the county was not required to consider that question in connection with his application for rezoning. Because we conclude that LUBA erred as asserted in petitioner's first assignment of error, we need not consider petitioner's other assignments.

---

[12] As to the latter point, we note that, to the extent applicant and the county characterize petitioner's challenge in this case as a "collateral attack" on the legality of the parcels at issue, we do not understand petitioner to be challenging the creation or existence of tax lots 905A and 905B for all purposes; rather, he challenges only their legality as "parcels" for the purpose of the current rezoning proceeding. Thus, we question whether it is proper or useful to regard his challenge as a collateral attack that necessarily unsettles the result of a previous action or proceeding.

Reversed and remanded to LUBA with instructions to remand to the county for further proceedings on applicant's application for rezoning, including consideration of the legal status of the relevant parcels.

# APPENDIX